NEW ENGLAND TELEPHONE AND
TELEGRAPH COMPANY, d/b/a
Bell–Atlantic–Rhode Island,

v.

CONVERSENT COMMUNICATIONS
OF RHODE ISLAND, L.L.C. f/k/a
New England Voice and Data, L.L.C.;
the State of Rhode Island and Provi-
dence Plantations Public Utilities
Commission; Kate F. Racine and
Brenda K. Gaynor, in their official
capacities as Commissioners of the
Rhode Island Public Utilities Com-
mission.

C.A. No. 99–603–L.

United States District Court,
D. Rhode Island.

Nov. 8, 2001.

John J. Patridge, Esq., Patridge, Snow & Hahn, Providence, RI, Keefe B. Clemons, Esq., Bell Atlantic Regulatory Counsel, Boston, MA, Sean A. Lev, Esq., Kellog, Huber, Hansen, Todd & Evans, Washington, DC, for Plaintiff(s).

John D. Deacon, Esq., Little, Bulman, Medeiros & Whitney, Providence, RI, Leo J. Wold, Esq., Attorney General's Office, Providence, RI, for Defendant(s).

Benjamin V. White, III, Vetter & White, Inc., Providence, RI, John F. Ward, Jr., Esq., Darryl M. Bradford, Esq., John R. Harrington, Esq., Jenner & Block, Chicago, IL, for Intervenor-defendant (Brooks Fiber Communications of Rhode Island).

## OPINION AND ORDER

LAGUEUX, District Judge.

This action arises pursuant to 47 U.S.C. § 252(e)(6) which grants this Court the power to review certain state public utility commission actions authorized by the Telecommunications Act of 1996. In the instant case, Verizon Rhode Island ("Verizon") is appealing a decision of the Rhode Island Public Utilities Commission ("PUC") relating to an interconnection agreement ("Agreement") between Verizon and Conversent Communications of

Rhode Island ("Conversent").[1] The PUC order, articulated on June 29, 1999 and issued on July 21, 1999, determined that Internet traffic was local traffic under the Agreement and, therefore, was subject to reciprocal compensation. Appellant Verizon contends that the PUC decision was in error, was arbitrary and capricious, and, that the PUC violated its due process rights. Stripped down to basics, Verizon does not want to compensate Conversent for telephone calls that Verizon customers make to Internet providers whose telephone service is provided by Conversent. If the PUC order stands, Verizon will be liable to make payments to Conversent under the Agreement. To understand this simple problem, however, this Court must explain the peculiar background of the Act, this dispute and the role that this Court has to play in the matter. Because this Court concludes that Verizon's procedural rights were violated, the PUC's decision is reversed and the case is remanded to that body. Thus, the Court does not reach the substantive portion of Verizon's challenge.

BACKGROUND

In an effort to increase competition, expand services and promote innovation in the American telecommunications industry, Congress passed the Telecommunications Act of 1996 ("the Act"). Pub.L. No. 104–104, § 101(a), 110 Stat. 61, 66 (1996). One of the focuses of the Act, and the central concern in this case, is the restructuring of local telephone markets. Congress recognized that technological advances rendered obsolete the view that local telephone providers were monopolies.

Congress, therefore, sought to encourage competition in the local telephone market by reducing barriers to market entry. *See AT & T Corp. v. Iowa Util. Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999).

To achieve this goal, the Act also imposed new regulatory governance on the local telephone industry. 47 U.S.C. §§ 251, 252 (Supp. II 1996). Formerly, local telephone providers had been entirely regulated by state utility commissions. *See AT & T Corp.*, 525 U.S. at 371, 119 S.Ct. 721. Under the Act, Congress replaced this state regulatory regime with an unique shared scheme in which private companies, state utility commissions and the Federal Communications Commission ("FCC") have important, but not always clear-cut, roles to play. *See id.* at 385 n. 10, 119 S.Ct. 721. This approach has been termed "cooperative federalism" by some. *Puerto Rico Tel. Co. v. Telecomm. Reg. Bd.*, 189 F.3d 1, 14 (1999).

To create a competitive local telephone market, Congress required all local telephone carriers to connect their networks so that service could be completed between the customers of two different service providers. 47 U.S.C. § 251(a)(1). For existing providers (also know as incumbent local exchange carriers), the Act imposes additional duties to mitigate the advantages of possessing an established infrastructure to deliver services. These additional duties are designed to prevent new entrants from being shut out of the market. 47 U.S.C. § 251(c). For example, when a new entrant seeks access to a local

1. The parties in this case have changed names multiple times. At the time of the PUC order, appellant was New England Telephone and Telegraph Company. When the instant lawsuit was filed, Appellant had become Bell Atlantic Rhode Island. Today, Appellant is Verizon Rhode Island. Although Verizon has not moved to amend the complaint to reflect the name change, for simplicity this Court will use Verizon throughout this opinion. Similarly, Appellee Conversent was known as New England Voice and Data, L.L.C. at the time of the PUC order. In an effort to avoid confusion, the parties will be referred to by their current monikers throughout this decision.

telephone carrier's network, the incumbent local exchange carrier has a duty to negotiate terms for interconnection and provide interconnection to the prospective entrant on a non-discriminatory basis. 47 U.S.C. § 251(c)(1),(2).

Once the parties have negotiated an interconnection agreement, it must be submitted to the state utility commission for approval or rejection. 47 U.S.C. § 252(a)(1). If there is a dispute in the negotiations, either party may ask the state commission to mediate. 47 U.S.C. § 252(a)(2). Furthermore, if voluntary negotiations fail, the new entrant may request that the state commission arbitrate any open issues. 47 U.S.C. § 252(b)(1). Before the interconnection agreement is effective, the state commission, after determining that the agreement complies with §§ 251, 252 and any pertinent FCC regulation, must approve the agreement. If the state commission declines to act, the FCC assumes the state commission's responsibilities. 47 U.S.C. § 252(e)(5).

Within this model, Congress preserved the traditional state role in local telephone regulation, although state authority, particularly in the area of market entry, is rendered subservient to the federal government. *See* 47 U.S.C. § 251(d)(3) (preserving state regulation so long as it does not frustrate the purposes of the Act). Essentially, the scope of state commission discretion is established at the pleasure of the FCC since the FCC can issue regulations that a state commission is required to follow when executing its duties under the Act. *See AT & T Corp.*, 525 U.S. at 378 n. 6, 119 S.Ct. 721. Furthermore, Congress has employed private actors, the local telephone carriers, to do much of the "regulatory" leg-work. The local carriers have a very active role to play in drafting interconnection agreements. *See* 47 U.S.C. § 251(a)-(c) (establishing the duties and obligations of exchange carriers). The interconnection agreements are in some ways regulations arrived at through consensual negotiations as opposed to regulations delivered in the form of command and control edicts.

With an overview of the regulatory framework laid out, some background on the specific nature of interconnection agreements and FCC action in the area is needed. Interconnection agreements set the terms by which new market entrants can use existing local networks and vice versa. 47 U.S.C. § 251(a),(b). The interconnection agreements include reciprocal compensation arrangements, the means by which one carrier is compensated for completing a local call from another carrier. 47 U.S.C. § 251(b)(5). The assumption behind reciprocal compensation is that the call volume between the interconnected networks would be balanced and, similarly, the compensation would be balanced. The present dispute is about the definition of "local traffic" and, specifically, whether it includes Internet traffic. The definition of "local traffic" determines for what services compensation is paid and, thus, how much money the parties will pay to each other.

The definition of local traffic has been in dispute since the Act passed in 1996. The FCC has tried to clarify these muddy waters several times, but its attempts have largely churned up more confusion. In 1996, the FCC issued a rule and order stating that reciprocal compensation applies only to "traffic that originates and terminates within a local area." *In Re: Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15499, 16013 (1996) ("1996 FCC Ruling"). Thus, intrastate traffic is subject to reciprocal compensation and interstate traffic is not. This seemingly clear-cut distinction is actually

not very clear, especially when the Internet is involved.

To communicate on the Internet, a person uses his or her computer and telephone line to dial into an Internet service provider ("ISP"). The ISP then connects the computer user with the party that the computer user seeks. If the computer user uses one local telephone carrier and the ISP uses a different local telephone carrier, then one must determine if the call is subject to reciprocal compensation. If the call is considered from the computer user to the ISP (i.e., originating and terminating in the local area), then the call would be local and could be subject to reciprocal compensation. If the call is considered on an end to end basis (i.e., an e-mail from the computer user, via the ISP, to a friend across the country) then the call would not terminate in the local area and would not be subject to reciprocal compensation. To further complicate matters, a call could be from a computer user, via the ISP, to a neighbor down the street. This traffic obviously originates and terminates in the local area. *See, e.g., In Re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 14 F.C.C.R. 3689, 3694, 1999 WL 98037 (1999), *vacated, Bell Atlantic Tel. Co. v. FCC*, 206. F.3d 1, 3 (D.C.Cir.2000)(describing interstate and intrastate traffic).

The characterization of ISP-bound traffic determines how much money some carriers receive and how much other carriers pay. Internet calls tend to be longer than average local calls and ISPs do not "call back" at the same volume, if at all. The difference in the calling pattern of regular telephone users and Internet telephone users creates an imbalance that disrupts a basic assumption behind reciprocal compensation: that the carriers' interconnection use will be roughly balanced. In other words, if ISP-bound traffic is local, some incumbent local exchange carriers are forced to compensate competing carriers with ISP clients, without very much likelihood that a similar payment will inure to the incumbent's benefit. *See, e.g., Southwestern Bell Tel. Co. v. Connect Comm. Corp.*, 225 F.3d 942, 945 (8th Cir. 2000) (describing the economics at play). "Internet usage has distorted the traditional assumptions [about interconnection] because traffic to an ISP flows exclusively in one direction, creating an opportunity for regulatory arbitrage and leading to uneconomical results." *In re Implementaitno of the Local Competition Provisions in the Telecommunications Act of 1996*, F.C.C. 01–131, at 12 (April 18, 2001) (hereinafter "2001 FCC Ruling").

In response to the confusion over the nature of traffic involving ISPs, the FCC issued a declaratory ruling in 1999. 14 F.C.C.R. 3689. The FCC concluded that, for jurisdictional purposes, whether a call made to an ISP was interstate should be determined by looking at the starting and ending points of the transmission, and not at the location of the ISP. This view renders most ISP-bound traffic interstate. *Id.* at 3697. The FCC, however, declined to issue any rule governing compensation for ISP traffic. *Id.* at 3703. In lieu of issuing a rule in this area, the FCC decided to let state commissions continue to determine if ISP traffic is subject to reciprocal compensation. *Id.* at 3703–706; *see also Bell Atlantic Tel. Co.*, 206 F.3d at 3 (noting that the FCC ruling left incumbent carriers at the mercy of state commissions until the FCC issued a definitive rule).

As a result of the discretion that the FCC granted to state commissions, most state commissions, including the Rhode Island PUC, ruled that ISP-bound traffic was subject to reciprocal compensation. *See* 2001 FCC Ruling at 32 n. 127. The

1999 FCC ruling, however, was vacated by the Circuit Court of Appeals for the District of Columbia. *Bell Atlantic Tel. Co.*, 206 F.3d at 8. The D.C. Circuit faulted the FCC for not adequately explaining its reasoning for finding that ISP-bound traffic was not local traffic and therefore not subject to reciprocal compensation. *Id.* That Court acknowledged that, without an FCC ruling, incumbent carriers were still subject to regulation by state commissions. *Id.* at 9. Therefore, state commissions maintained authority to act in this area.

After the *Bell Atlantic* decision, the FCC adopted a third ruling governing ISP-bound traffic and issued an accompanying order on remand. The FCC ruled definitively that ISP-bound traffic was not subject to reciprocal compensation arrangements. 47 C.F.R. § 51.701 (2001); 2001 FCC Ruling at 13. The FCC also ruled that it maintained jurisdiction to issue regulations regarding ISP-bound traffic. 2001 FCC Ruling at 31.

The FCC, in a prospective rule, prohibited state commissions from making decisions regarding inter-carrier compensation for ISP-bound traffic. *Id.* at 39. The FCC required that all new compensation agreements for ISP-bound traffic be subject to the "bill and keep" method of cost recovery, whereby each carrier recovers costs from its own end users. *Id.* at 38–39.

This ruling does not resolve the controversy before the Court because the FCC declined to overturn state commission decisions that had ruled that ISP-bound traffic was subject to reciprocal compensation. The FCC also did not invalidate any previously negotiated agreements granting reciprocal compensation for ISP-bound traffic. Instead, for those agreements already in existence, the FCC adopted an interim inter-carrier compensation regime. 47 C.F.R. § 51.715; 2001 FCC Ruling at 36–37. Under the 2001 FCC ruling, some interconnection agreements imposing reciprocal compensation on ISP-bound traffic are subject to rate caps and an overall phase out. 2001 FCC Ruling at 37–38.

PROCEDURAL HISTORY

In September 1998, Conversent opted into an existing interconnection agreement between Brooks Fiber and Bell Atlantic–RI (now Verizon–RI) assuming Brooks Fiber's role. The Interconnection Agreement under Sections 251 and 252 of the Telecommunications Act of 1996' was entered into on May 22, 1997. The Agreement does not reference ISP-bound traffic directly, but does define the term "reciprocal compensation," as "described in the Act." "As Described in the Act" is also a defined term in the Agreement, meaning "as described in or required by the Act and as from time to time interpreted in the duly authorized rules and regulations of the FCC or the PUC."

In May, 1999, Conversent petitioned the PUC for a declaratory judgement that ISP-bound traffic be treated as local traffic subject to reciprocal compensation. Verizon subsequently moved to dismiss the petition for declaratory judgement on procedural grounds. Verizon claimed that Conversent's petition violated the PUC's own rules and the Rhode Island Administrative Procedures Act. Verizon also contended that federal law does not require the payment of reciprocal compensation on ISP-bound traffic and that Conversent was aware that Verizon never intended that ISP-bound traffic would be subject to reciprocal compensation. On June 23, 1999, Conversent filed its opposition to the motion to dismiss. Conversent, of course, disputed Verizon's claims.

Two days after Conversent's second motion was filed, on June 25, 1999, the PUC apparently issued an Open Meetings Agenda for June 29, 1999. The agenda included

a notice that Conversent's petition for declaratory relief would be discussed at the meeting. The agenda also indicated that Verizon had filed a motion to dismiss the petition. At the June 29, 1999 PUC meeting, the PUC rejected Verizon's motion to dismiss. The PUC also moved to accept Conversent's petition for declaratory judgement that ISP-bound traffic be considered local traffic and subject to reciprocal compensation. As a final related item, the PUC voted to open a separate, generic docket to discuss its powers to establish reciprocal compensation policies in light of the FCC's Internet traffic order. It requested that the parties brief the PUC on this issue. PUC, Minutes of June 29, 1999 Open Meeting.

On July 7, 1999, Verizon filed a motion to reopen the proceedings arguing that the PUC had violated its procedural rights under the Rhode Island General Laws and the PUC's internal rules. Conversent filed an opposition motion on July 12, 1999 and Verizon filed a reply on July 16, 1999.

On July 21, 1999, the PUC issued its written order for the ruling adopted on June 29, 1999. The written order declared that ISP-bound traffic should be treated as local traffic subject to reciprocal compensation for the purposes of the interconnection agreement. On the same date, the PUC denied Verizon's motion to reopen the proceedings. In June, 2000, Verizon filed suit in this Court, against the PUC, seeking a reversal of the PUC's decision on substantive and procedural grounds. Verizon argues that the PUC erred in its interpretation of the Agreement. Appellant also argues that the PUC rendered an arbitrary and capricious decision and did not provide sufficient procedural protec-

tion before it deprived Verizon of its property, a classic procedural due process argument.

## JURISDICTION AND SCOPE OF REVIEW

In the Act, Congress created an unusual role for federal district courts. Under § 252(e)(6), this Court is an appellate court for certain state commission decisions.[2] The Act explicitly creates federal district court jurisdiction over state commission approvals or rejections of interconnection agreements. The Act is ambiguous, however, regarding federal district court jurisdiction over other state commission determinations relating to interconnection agreements. This thorny jurisdictional question is made even more complicated because state courts are precluded from hearing appeals from state commissions. 47 U.S.C. § 252(e)(4). Potentially, there could be a jurisdictional gap, where the parties would not have an opportunity for appellate review of state commission action.

■ Although neither party has contested the jurisdiction of this Court, the Court has a duty to explain its basis for subject matter jurisdiction, especially where, as in § 252(e)(6) litigation, the scope of jurisdiction is disputed and will determine what issues can be resolved by this Court. Fed. R.Civ.P. 12(h)(3) ("Whenever it appears ... that the court lacks jurisdiction of the subject matter, the court shall dismiss the matter."); *White v. Gittens*, 121 F.3d 803, 806 (1st Cir.1997) ("It is too elementary to warrant citation of authority that a court has an obligation to inquire sua sponte into its subject matter jurisdiction, and to proceed no further if such jurisdiction is wanting." [citations omitted] ). The parties

**2.** "In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6).

have asserted no other basis for this Court's jurisdiction, such as general federal question jurisdiction under 28 U.S.C. § 1331.

The exact boundaries of a federal district court's subject matter jurisdiction under § 252(e)(6) are, to say the least, unclear. Although the statute establishes jurisdiction to review approvals and rejections of interconnection agreements, it does not state if this Court has jurisdiction to review matters arising after an interconnection agreement has been approved. Section 252(e)(6) refers to a federal district court's ability to review a state commission "determination", but that term is not defined. The Circuit Courts have divided on the proper approach to federal jurisdiction under this statute. In March, 2001, the Supreme Court granted certiorari to decide the exact scope of federal subject matter jurisdiction under § 252(e)(6). *Mathias v. WorldCom Tech, Inc.,* —— U.S. ——, 121 S.Ct. 1224, 149 L.Ed.2d 135 (2001).

The First Circuit has addressed federal jurisdiction under this Act, but declined to decide the precise issue presently before the Court. The First Circuit held that a utility commission's action was not a determination under the Act and, therefore, not subject to review by the federal district court. *Puerto Rico Tel. Co.,* 189 F.3d at 13. Furthermore, the First Circuit held that 47 U.S.C. § 252(e)(6) does not authorize district court review of state commission actions for compliance with state law. *Id.*

The First Circuit explicitly left unresolved whether interpretation of existing interconnection agreements is included within the meaning of "determination" for the purposes of federal subject matter jurisdiction. *Id.* at 10. The threshold question under the *Puerto Rico Telephone* decision is whether a state commission's

actions are a "determination". The First Circuit assumed, without deciding, that an order is a "determination" if it has a sufficient nexus with the interconnection agreement. *Id.* at 11, 13. The First Circuit rejected the district court's strict construction of jurisdiction, excluding any issue of state law, even where it conflicted with federal law. *Id.* at 15. Here, as in *Puerto Rico Telephone,* there is no issue that the PUC rejected or failed to approve the interconnection agreement. *See id.* at 10. The sole question is whether the PUC action is a "determination" that would fall under § 252(e)(6)'s jurisdictional reach.

In this case, unlike the scenario the First Circuit was addressing in *Puerto Rico Telephone,* the PUC was purporting to interpret the interconnection agreement itself. In *Puerto Rico Telephone,* the party was essentially trying to get federal appellate review of a Puerto Rican consumer protection requirement that might have had an indirect effect on the agreement. *See id.* at 12–13. In the present case, the PUC has decided the meaning of a key term of the Agreement. Therefore, this Court concludes that the PUC's decision has a sufficient nexus to the Agreement to be a "determination" under § 252 and that, under *Puerto Rico Telephone,* the Court has jurisdiction to review the PUC decision. *See id.* at 11, 13.

■ Deciding that this Court has jurisdiction over this matter does not resolve the scope of this Court's review. Several Circuit Courts have held that, at a minimum, federal district courts have the authority to review state commission determinations for compliance with federal law. *See, e.g., MCI Telecomm. Corp. v. U.S. West Comm.,* 204 F.3d 1262, 1266 (9th Cir.2000) (holding that federal jurisdiction extends only to determining compliance with federal law); *Illinois Bell Tel. Co. v.*

*WorldCom Tech. Inc.*, 179 F.3d 566, 571 (7th Cir.1999) (reviewing state commission order for violations of federal law, not state law); *but see Bell Atlantic Md. Inc. v. MCI Worldcom Inc.*, 240 F.3d 279, 307 (4th Cir.2001), *cert. granted*, — U.S. —, 121 S.Ct. 2548, 150 L.Ed.2d 715 (June 25, 2001) (holding that there is no federal jurisdiction over state commission orders administering and enforcing interconnection agreements). Other Circuit Courts have concluded that § 252(e)(6) confers broader jurisdiction. The Tenth Circuit held that federal jurisdiction extended to any state commission interpretations made pursuant to authority granted to it by the Act. *Southwestern Bell Tel. Co. v. Brooks Fiber Comm., Inc.*, 235 F.3d 493, 497 (10th Cir. 2000); *see also Southwestern Bell Tel. Co. v. Connect Comm. Corp.*, 225 F.3d at 948 (holding that federal jurisdiction extended to state commission actions made pursuant to federal law). Those Circuit Courts have reasoned that federal courts must be able to review exercises of federal power made by state commissions enforcing § 252 and not just compliance with federal law. *See, e.g., Southwestern Bell Tel. Co. v. Brooks Fiber Comm.*, 235 F.3d at 497; *Southwestern Bell Tel. Co. v. Connect Comm. Corp.*, 225 F.3d at 948; *see also Southwestern Bell Tel. Co. v. Pub. Util. Comm'n*, 208 F.3d 475, 481–82 (5th Cir.2000) (holding that federal jurisdiction extends to review of state commission rulings on complaints pertaining to interconnection agreements).

This Court generally agrees with those Circuit Courts that have held that § 252(e)(6) confers broad federal jurisdiction to federal district courts reviewing state commission actions. Congress intended federal law to govern issues of market access, gave the FCC the power to preempt state action, and made federal jurisdiction, at least with respect to the approval and rejection of interconnection agreements, exclusive. For § 252 jurisdiction to be read narrowly would be to create an unprecedented complicated scheme with extremely unclear roles for federal and state courts. Until the Supreme Court of the United States determines otherwise, this Court will assume that it has subject matter jurisdiction in this kind of case. Thus, this Court is not limited to determining if state commission rulings comply with federal law. Based on the First Circuit's *Puerto Rico Telephone* decision, however, the Court cannot hear claims based purely on state law. *See* 189 F.3d at 13.

Any decision of this Court must stem from its jurisdiction under § 252. Although a due process claim raises a federal question, without § 252 federal jurisdiction, the proper procedure for the parties is further appeal in the state courts. It is a basic principle of subject matter jurisdiction that federal district courts should not serve as appellate courts for state court decisions, or for that matter, state administrative agencies acting in an adjudicatory manner. *See, e.g., Wilson v. Shumway*, 264 F.3d 120 (1st Cir.2001) (discussing the Rooker–Feldman Doctrine). State courts are equally competent to decide questions of federal law. Section 252 is a narrow exception to this principle, whereby Congress has specifically delegated appellate review to the federal district courts while at the same time removing state court jurisdiction. 47 U.S.C. § 252(e)(4),(6). Therefore, this Court may only hear the federal due process claim if it also has jurisdiction under § 252.

█ This Court, however, does not have subject matter jurisdiction over the state procedural claims, based on the Rhode Island Administrative Procedures Act and the PUC's own procedural rules. Under § 252, the Court does not have jurisdiction to address matters of state law and any

appeal of state law issues should be made to state court. *See Puerto Rico Tel. Co.*, 189 F.3d at 13. A state procedural violation is clearly not a "determination" under § 252(e)(6).

■ Furthermore, this Court cannot address claims based on state procedural violations as a matter of supplemental jurisdiction. This Court's jurisdiction is based solely on § 252(e)(6), which confers on this Court appellate, not original jurisdiction. The statute creating supplemental jurisdiction for this Court applies only to "civil action of which the district courts have original jurisdiction." 28 U.S.C. § 1367 (1994). Here, the parties are invoking the narrow federal appellate jurisdiction of this Court, and the Court cannot exercise supplemental jurisdiction over a state law issue pursuant to 28 U.S.C. § 1367.

For the foregoing reasons, this Court will review the procedural claims for constitutional and federal law violations, but not for non-compliance with state law.

PROCEDURAL CLAIMS

Appellant Verizon presents two arguments that the PUC committed procedural error when it issued the July 21, 1999 order. First, Verizon argues that the PUC, by violating its procedural rules, rendered an arbitrary and capricious decision and, thus, its decision should be vacated. Second, Verizon claims that the PUC deprived Verizon of property without due process of law.

A. Arbitrary and Capricious

 1. Alleged Violations of State Procedural Rules

Verizon argues that because the PUC failed to conform to required procedures, its decision is arbitrary and capricious and, thus, should be vacated. One type of arbitrary and capricious claim stems

from an agency's deviation from required procedures. This Court, as previously discussed, does not have jurisdiction to review state procedural violations. In addition, this Court has serious doubts as to whether the PUC is bound by state procedural rules at all when acting pursuant to federal authority under § 251 and § 252.

Congress has the authority to mandate that state actors follow federal procedural requirements in any field where it can preempt state authority. *See FERC v. Mississippi*, 456 U.S. 742, 771, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). Under the Act, Congress mandated certain procedural rules for state commissions when they approve or reject interconnection agreements. 47 U.S.C. § 252(b)(4). Congress also precluded state courts from reviewing the actions of state commissions when approving or rejecting agreements. 47 U.S.C. § 252(e)(4). Thus, Congress has demonstrated an intention to federalize the procedure, at least, in the approval and rejection of interconnection agreements. The Act, however, does not include procedural requirements for state commission "determinations" under § 251 and § 252. As such, whether the state commissions must abide by state procedures when rendering determinations, but not when approving or rejecting agreements reflects the same ambiguity as the exact scope of federal jurisdiction.

Whether state procedural rules apply to this situation, however, is an issue that this Court need not resolve. The lack of jurisdiction over state procedural law leads to the same result in this case. The Court will not review the PUC order for violations of state procedures.

 2. Errors in the PUC's Fact Finding Process

The Court can review the PUC's fact-finding actions for compliance with federal

law. Essentially, by claiming that the PUC violated its own procedural rules, Verizon argues that the PUC was arbitrary and capricious in making its findings of fact. Here, the PUC selected allegations (contested by the parties) from the pleadings, made factual findings from those allegations (without an evidentiary hearing), and decided the parties' intent regarding an Agreement as a matter of law.

The Act does not specify the standard of review that this Court must use in reviewing state commission decisions, and there is no direct precedent binding this Court to a particular standard. Furthermore, the Administrative Procedure Act does not apply because the PUC is not an "agency" under that Act. *See* 5 U.S.C. § 701(b)(1) (1994) (defining agency as an "authority of the Government of the United States").

■ For issues other than interpretation of federal law, including findings of fact, most Circuit Courts have concluded that the norm for review is an arbitrary and capricious standard. *See, e.g., Southwestern Bell Tel. Co. v. Brooks Fiber Comm.*, 235 F.3d at 498; *Southwestern Bell Tel. Co. v. Pub. Util. Comm'n*, 208 F.3d at 482; *U.S. West Comm. v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1117 (9th Cir.1999), *cert. denied*, 530 U.S. 1284, 120 S.Ct. 2741, 147 L.Ed.2d 1005 (2000); *but see GTE South, Inc. v. Morrison*, 199 F.3d 733, 745–46 (4th Cir.1999) (applying the substantial evidence standard to state commission factual determinations, but noting that there is no meaningful difference from arbitrary and capricious review); *MCI Telecomm. Corp.*, 204 F.3d at 1266–267 (same). Given the general consensus regarding the correct standard to use when reviewing state commission orders made pursuant to 47 U.S.C. § 252(e)(6), this Court will use the arbitrary and capricious

standard to review the PUC's factual findings and conclusions drawn from them.

Under federal law, if an agency's actions, findings and conclusions are arbitrary, capricious, an abuse of discretion or not in accordance with law, the Court must vacate the agency's decision. *See Sierra Club v. Marsh*, 976 F.2d 763, 769 (1st Cir.1992). This Court must review the PUC's action to ensure that PUC considered all the relevant factors, articulated a reasonable connection between the facts and the conclusion drawn, and did not make a clear error in judgement. *Penobscot Air Serv. Ltd. v. FAA*, 164 F.3d 713, 719–20 (1st Cir.1999). "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The focus of the arbitrary and capricious standard is on the rationality of the agency's decision-making process, not the rationality of its decision. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir.1994). Arbitrary and capricious is a deferential standard of review, but it is not a rubber stamp. *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 203 (1st Cir.1999). The reviewing court must conduct a "thorough, probing, in-depth review" and a "searching and careful" inquiry into the record. *Id.* (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)).

■ The standard may be applied to mixed questions of law and fact, such as

reviewing an agency's summary judgement order. *Puerto Rico Aqueduct & Sewer Auth. v. EPA*, 35 F.3d 600, 604 (1st Cir. 1994). In addition to requiring a reasoned basis for agency action, the arbitrary and capricious standard requires an agency's action to be supported by the facts in the record. *Olenhouse*, 42 F.3d at 1575; *Kelly v. United States*, 34 F.Supp.2d 8, 12 (D.D.C.1998) (concluding an agency's decision was arbitrary and capricious because "internal tensions, a paucity of factual findings, and incoherent reasoning plague the . . . decision").

To understand the nature of the PUC's actions, this writer will briefly review the strange travail of this claim. Conversent petitioned the PUC for an interpretation of its agreement with Verizon. Conversent styled its petition as a motion for declaratory relief. Verizon filed an answer with the PUC, arguing that the petition should be dismissed.[3] Verizon claimed, in part, that Conversent's petition did not meet the requirements under the PUC rules and Rhode Island General Laws for a declaratory judgement because it failed to name a rule or statute to be interpreted. Although, as already discussed, this Court cannot review PUC actions for compliance with state procedural rules, this Court agrees that the PUC was not issuing a declaratory judgement on July 29, 1999.

A declaratory judgement is an equitable tool used by courts to define the legal rights and obligations of parties. In a declaratory judgement action, there may be questions of law and fact for the trial court to decide. Here, the PUC, acting in many ways as a trial court, failed to hold a hearing on the legal or factual issues at stake. The PUC did put the issue on its regular meeting agenda, and this Court assumes that the parties had notice of the proceedings. There is nothing, however, from the scant record below to show that the parties themselves received specific notice of the hearing. Furthermore, the notice only indicated that the issues would be discussed, and did not state that the parties would have a chance to be heard or that the PUC was in a procedural posture to decide the basic dispute or any of the motions before the commission.

At the June 29, 1999 commission meeting, the PUC then made an adjudicatory decision, without taking evidence. In essence, the PUC issued a summary judgement ruling, not a declaratory judgement. The PUC decided the dispute as a matter of law.

No party, however, at any time petitioned the PUC for anything that would resemble summary judgement on the merits. Verizon filed a motion for dismissal, but on procedural, not substantive grounds. In response, Conversent argued that the PUC should find that the parties intended to include Internet traffic as local traffic under the interconnection agreement or that the PUC should issue a gen-

---

**3.** Although Verizon was allowed to file an answer, there is nothing in the record to indicate that Verizon was ever joined in the litigation. It is a basic premise of procedure that all interested parties should be joined in a declaratory judgement action, so that they may properly appear before the Court. There can be no more necessary and indispensable party in this case than Verizon, the other party to the Agreement. When Conversent seeks to have its rights determined, it is also, obviously, seeking a determination of Veri-

zon's rights and obligations. Because the PUC did not make clear that Verizon was joined in this litigation, it compromised Verizon's ability to pursue all of its rights to appeal. This was the first strange procedural decision of the PUC.

However, in accepting Verizon's reply brief, the PUC obviously treated Verizon as an indispensable party, and, therefore, Verizon has been de facto joined and may appear before this Court to seek review of the PUC's declaratory judgement.

eral rule that Internet traffic is local traffic under interconnection agreements. In a concluding sentence, Conversent stated that the PUC need not hold an adjudicatory hearing or take additional evidence to reach its decision. That one sentence can hardly be considered a motion for summary judgement that would put the other party on adequate notice that the PUC would issue a ruling prior to taking evidence or even hearing arguments. In addition, Conversent's reply brief was filed on July 23, 1999, a mere six days prior to the June 29, 1999 meeting where a final decision was rendered. If that one sentence was a summary judgement motion, Verizon was entitled to have time to respond.

■ Before issuing summary judgement, a court must look to the record and determine that there is no genuine issue of material fact and that the moving party is entitled to judgement as a matter of law. *E.g.*, Fed.R.Civ.P. 56(c). It is common practice for an agency to issue administrative summary judgement, whereby the agency dispenses with an evidentiary hearing. *See Puerto Rico Aqueduct*, 35 F.3d at 607 (noting that "administrative summary judgement has maintained a close relationship with Rule 56"). Due process does not require an agency to hold an evidentiary hearing if "it appears conclusively from the papers that on the available evidence, the case can only be decided one way." *Id.* at 606. At the summary judgement stage, the tribunal views the facts in the light most favorable to the non-moving party. Because a court must know what facts are material to the case, some discovery often precedes summary judgement or undisputed facts are presented to the court. A court reviewing an agency's summary decision must examine the agency's findings against the record for accuracy and determine if the findings warrant denial of a hearing. *Id.* at 609.

■ Here, there were contested facts and those facts might well be material to the outcome of the case. In this case, the de facto non-moving party was Verizon. The PUC, however, disregarded Verizon's claim as to disputed facts to rule in favor of Conversent. The PUC selectively picked through the pleadings for certain allegations, and from them, made a factual finding on the intent of the parties. *See NEVD of R.I. Petition for Declaratory Judgement that Internet Traffic Be Treated as Local Traffic Subject to Reciprocal Compensation*, PUC Order No. 15915, 18 (July 21, 1999).

This Court does not agree with the PUC that, on the pleadings, examining the facts in a light most favorable to the non-moving party to determine the intent of the parties, an evidentiary hearing was not warranted. This Court can cite a list of conclusory statements made by the PUC that were disputed in the pleadings. For example, the PUC concluded that because the Agreement did not include a specific exclusion of ISP-bound traffic from local traffic, the Agreement unambiguously reflects the party's intent that ISP-bound traffic would be subject to reciprocal compensation. The PUC also found support for its reading of Verizon's intention from the fact that Verizon allowed customers to call ISPs as local calls, and because Verizon had been paying reciprocal compensation to Brooks Fiber, Conversent's predecessor to the Agreement. The PUC ignored Verizon's contention that Conversent knew that Verizon did not intend to pay reciprocal compensation for ISP-bound traffic. The PUC apparently did not consider Verizon's contention that, although it paid carriers for some ISP-bound traffic, it notified providers promptly that it did not consider such

traffic eligible for reciprocal compensation. Since the Agreement's definition of reciprocal compensation tracked federal law, the PUC should have examined how the parties meant to incorporate the ambiguous legal rulings such as the 1999 FCC Ruling regarding Internet traffic. Additionally, the PUC relied on the fact that Verizon allowed customers to call ISPs as local calls, but ignored that it did so pursuant to an FCC mandate. *See id.* at 17–19.

This Court also notes that the PUC knew that reciprocal compensation for ISP-bound traffic was not required by law, because it opened up a docket to review the matter in its legislative rule-making capacity. *See* PUC, Minutes of June 29, 1999 Open Meeting. The motion, in part, asked the parties to brief the PUC on "the effect of the FCC's Internet Traffic Order on the power of the states to establish reciprocal compensation policies." *Id.* Therefore, the PUC was determining the meaning of the contract as intended by these two parties, and not establishing a general definition of reciprocal compensation in Rhode Island.

This Court understands that the PUC is not a trial court and, as a state administrative agency, may during its regular course of business follow different procedural practices. Similarly, this Court does not usually find itself in the role of an appellate court of state agency action. Nevertheless, this Court must attempt to fulfill the unusual role created by § 252(e)(6).

Verizon did not get an even-handed hearing before the PUC. Because the PUC issued its order when there appeared to be numerous genuine issues of material fact and failed to hold an evidentiary hearing to determine whether there were genuine issues of material fact, the PUC committed clear error. *See Puerto Rico Aqueduct,* 35 F.3d at 606. This Court can find no ra-

tional connection between the decision made and the allegations presented to the PUC. *See Penobscot Air Serv.,* 164 F.3d at 719–20. The PUC took a list of factors, picked through the pleadings for allegations supporting those factors, and determined those allegations to be factual findings even though they were contested and no evidence was presented to support them.

From those "findings", the PUC made a determination of the parties' intent, a power it presumed because, at the time, the FCC had stated that the PUC could interpret interconnection agreements. *See* 14 F.C.C.R. at 3703–706. Interpreting the meaning of a provision, to the PUC, seems to be synonymous with imposing a meaning on a provision without considering disputed facts. It is not. One is adjudication and the other is legislation. This Court finds that the PUC should have held an evidentiary hearing because there were disputed factual issues. *See Puerto Rico Aqueduct,* 35 F.3d at 606, 609. Because the record here is so poor, this Court concludes that the PUC did not consider all the relevant factors and did not articulate a reasonable connection between the facts and conclusion drawn. *See Penobscot Air Serv.,* 164 F.3d at 719–20. Furthermore, because the PUC decided this issue in a summary manner, even though there was no specific motion for summary judgement, neither party had proper notice of the action to be taken at the regular meeting of July 29, 1999. For the preceding reasons, the action of the PUC was arbitrary and capricious.

### 3. Property Deprivation without Due Process of Law

Verizon also argues that it was deprived of its property without due process of law in violation of the United States Constitution. Under the Fourteenth Amendment,

state actors, such as the PUC, are required to follow the Constitution, and specifically the requirements of procedural due process.

■ Due process requires a meaningful hearing at a meaningful time before a deprivation of property can occur. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Verizon recites the familiar three factor weighting test annunciated by the United States Supreme Court in *Mathews* to determine if the procedures accorded to a party are adequate. The reviewing court must weight the private interest at stake, the risk of erroneous deprivation because of the procedures used as well as the probable value of more procedural safeguards, and the burden on the government of more procedural safeguards. *Id.* at 335, 96 S.Ct. 893.

■ Here, of course we are not dealing with the grave deprivation of an individual's only source of sustenance, a welfare check, or a disabled person's means of income. Indeed, the amount of money at stake is not the touchstone for determining the harm to the private interest, rather it is the degree of potential deprivation that is important. *Id.* at 341, 96 S.Ct. 893. Verizon stands to lose a significant amount of money under an adverse PUC determination. Verizon has an agreement, that is overseen by the PUC, setting forth Verizon's rights and obligations. The PUC redefined a key term in the Agreement without giving Verizon a meaningful opportunity to be heard, perhaps erroneously depriving Verizon of a substantial property interest in that contract. Furthermore, without more procedural protections, a potentially wrongful deprivation will be permanent, not temporary. *See id.* at 340, 96 S.Ct. 893. Therefore, the private interest at stake is great.

The second *Mathews* factor, risk of erroneous deprivation, is extremely apposite to this Court's concerns. *See id.* at 343, 96 S.Ct. 893. Here, more procedures would greatly decrease the risk of error in judgement. Given the confusion over the vague federal statute, the unclear FCC ruling (that was later overturned by the D.C. Circuit) and the mixed questions of regulatory law and contract interpretation, the parties, the PUC, and this Court would have greatly benefited from a clear record being developed as to the facts in dispute in this case. A hearing, specifically dedicated to the presentation of arguments would have similarly clarified what legal issues were in dispute, and perhaps even suggested that this was a matter of contract law better left to the state courts to sort out. Due process rights serve to ensure that individuals are treated with fairness when they appear before an adjudicatory body. *See Hermanowski v. Farquharson*, 39 F.Supp.2d 148, 156 (D.R.I. 1999). The Court has already recounted the unfair deficiencies in the quality of notice and hearing given to Verizon. They need not be repeated here.

As to the burden to government in giving more procedural protection, in the spirit of the "cooperative federalism" underlying § 252, this Court looks to both the burdens on the PUC and the federal district court. The additional work of having a hearing and a more developed factual record would greatly reduce subsequent difficulties and serve the public interest. *Mathews*, at 347–48, 96 S.Ct. 893. Finally, although the PUC has other important work to conduct, the burden facing the government in *Mathews* was the burden of holding thousands of hearing for welfare or disability recipients. *See id.* There are only a few telephone companies in Rhode Island seeking review of their interconnection agreements. A more formal hearing before the PUC, with proper notice to the parties and the opportunity to present evi-

dence on any disputed facts, would not unduly burden the PUC. In any event, if the PUC felt burdened, it could decline to act and defer its responsibilities to the FCC. *See* 47 U.S.C. § 252(e)(5).

For these reasons, the Court concludes that Verizon was deprived of its property without due process of law.

CONCLUSION

For the foregoing reasons, the PUC decision is vacated and the matter is remanded to the PUC for further determinations not inconsistent with this ruling and federal law. Since the factual record from the PUC is inadequate, this Court declines to reach the substantive arguments of appellant Verizon.

Additionally, this Court notes that in light of the 2001 FCC ruling, a PUC determination that the interconnection agreement, when entered, required reciprocal compensation for ISP-bound traffic may only entitle the parties to compensation under the interim inter-carrier compensation regime. *See* 2001 FCC Ruling.

The long and short of it here is that the PUC must treat this matter as a contested case, not as a rule-making matter, give the parties an opportunity to present evidence and make arguments and in the end make findings of fact and conclusions of law so that this Court can exercise its appellate jurisdiction in a meaningful way on an adequately developed record.

It is so ordered.