# United States Court of Appeals

## For the First Circuit

No. 06-2701

GLOBAL NAPS, INC.,

Plaintiff, Appellant,

v.

VERIZON NEW ENGLAND, INC., d/b/a VERIZON MASSACHUSETTS;
MASSACHUSETTS DEPARTMENT OF TELECOMMUNICATIONS AND ENERGY;
PAUL B. VASINGTON, in his capacity as Commissioner;
JAMES CONNELLY, in his capacity as Commissioner;
W. ROBERT KEATING, in his capacity as Commissioner;
DEIRDRE K. MANNING, in her capacity as Commissioner;
EUGENE J. SULLIVAN, JR., in his capacity as Commissioner,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before
Boudin, Chief Judge,
Torruella and Howard, Circuit Judges.

Glenn B. Manishin with whom William J. Rooney and Jeffrey C.
Melick were on brief for appellant.
Scott H. Angstreich with whom Michael E. Joffre, Kellogg,
Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Bruce P. Beausejour,
Verizon New England, Inc., and Keefe B. Clemons, Verizon, were on
brief for appellee Verizon New England, Inc.
Daniel J. Hammond, Assistant Attorney General, with whom
Martha Coakley, Attorney General, was on brief for appellee
Massachusetts Department of Telecommunications and Energy.

October 16, 2007

**BOUDIN, <u>Chief Judge</u>**.  The present appeal concerns the interpretation of an interconnection agreement between Verizon New England, Inc. and Global NAPs, Inc.  Verizon is an established telephone company, largely the descendant of Bell operating companies in New England and the mid-Atlantic states; Global NAPs is a competing carrier that shares Verizon's facilities in the course of providing its own services to customers.

The agreement between the two is governed primarily by the Telecommunications Act of 1996 ("1996 Act").[1]  The statute provides for such agreements, either negotiated or by arbitration, and divides authority over the process between federal and state regulators.  The provision most pertinent in this case requires, among other things, that the agreement set "reciprocal compensation arrangements for the transport and termination of telecommunications."  47 U.S.C. § 251(b)(5).

Once a new competitor is established in territory where it and Verizon both have customers, a compensation problem exists wherever a local call originates with a customer of one of the two companies and ends with a customer of the other.  The originating carrier gets revenue from its customer, whether on a per call basis

---

[1]Pub. L. No. 104-104, 110 Stat. 56 (codified as amended in scattered sections of 47 U.S.C. (2000)).  The background and general operation of that statute have been set forth in several of our recent decisions, <u>e.g.</u>, <u>WorldNet Telecomms., Inc.</u> v. <u>P.R. Tel. Co.</u>, __ F.3d __, 2007 WL 1376340, at *1 (1st Cir. 2007); <u>Global NAPs, Inc.</u> v. <u>Verizon New England, Inc.</u>, 444 F.3d 59, 61-65 (1st Cir. 2006).

or under some other payment plan; the terminating carrier gets no revenue associated with the call even though its facilities are being used to complete it. Reciprocal compensation paid to the destination carrier is one means of addressing this issue.

Where such an agreement is in force, Verizon would pay Global NAPs a negotiated fee for completing a Global NAPs' customer call. Conversely, Global NAPs would pay Verizon when a Global NAPs customer places a local call to a Verizon customer. The expectation is that the call volume between the two carriers will be roughly balanced so that neither company will be heavily in debt to the other as a result of such payments. New England Tel. & Tel. Co. v. Conversent Commc'ns of R.I., L.L.C., 178 F. Supp. 2d 81, 85 (D.R.I. 2001).

This balance has been disturbed by the rise in internet usage and thus in telephone calls placed to internet service providers ("ISPs") by customers who establish a "dial-up" internet connection. Such calls are primarily one-way and also tend on average to last longer than voice calls. Some new competitors have heavily solicited customers who are ISPs (e.g., by offering free service, or in some cases even paying ISPs to use their services) in order to collect large amounts of reciprocal compensation for terminating calls. See Global NAPs, Inc., 444 F.3d at 64.

Reciprocal compensation required by section 251(b)(5) applies only to local calls,[2] and in February 1999, the FCC determined that the ISP-directed calls to establish internet connections were not local calls under section 251(b)(5). Internet Traffic Order ¶ 1, 14 F.C.C.R. 3689, 3689-90 (1999). Although this order was vacated by an initial remand, Bell Atl. Tel. Cos. v. FCC, 206 F.3d 1, 3 (D.C. Cir. 2000), the FCC then reaffirmed its position, ISP Remand Order ¶¶ 77-88, 16 F.C.C.R. 9151, 9186-93 (2001). The D.C. Circuit again remanded for further proceedings, WorldCom, Inc. v. FCC, 288 F.3d 429 (D.C. Cir. 2002), cert. denied, 538 U.S. 1012 (2003), but has left the FCC ruling in force. See Global NAPs, 444 F.3d at 65.

In the ISP Remand Order, the FCC adopted an interim intercarrier compensation scheme to address the imbalance caused by ISP traffic, which became the sole vehicle for such compensation as of June 14, 2001.[3] Nevertheless, prior to this point, the FCC had left it open to interconnecting parties to agree to treat the traffic as subject to reciprocal compensation, even though not

---

[2]See Local Competition Order ¶ 1034, 11 F.C.C.R. 15499, 16013 (1996). For long distance calls, access charges are paid by long distance companies to local exchange carriers for the use of local network facilities. 47 C.F.R. § 69.2(a).

[3]The ISP Remand Order specified that its ruling would go into effect "30 days after publication in the Federal Register," ¶ 112, 16 F.C.C.R. at 9204, after which state commissions' authority to adopt other schemes was eliminated. See Verizon Cal., Inc. v. Peevey, 462 F.3d 1142, 1147 (9th Cir. 2006).

required by section 251.  The central question in this case is whether the current Massachusetts agreement between Verizon and Global NAPs requires compensation during the interim period between the start of the current 1998 agreement and the effective date of the FCC's interim plan.  Some history helps to frame the question.

In 1999, while Verizon and Global NAPs were operating under a prior 1997 agreement in Massachusetts, the Massachusetts Department of Telecommunications and Energy ("DTE") ruled that Global NAPs was not entitled to reciprocal compensation for ISP-bound calls under the agreement.  MCI WorldCom, Inc. v. New England Tel. & Tel. Co., D.T.E. 97-116-C, 1999 WL 634357, at *15 (Mass D.T.E. May 26, 1999).  Global NAPs responded by notifying Verizon that it intended to adopt for use in Massachusetts an interconnection agreement that it had negotiated with Verizon in 1998 for use in Rhode Island.

Recognizing that the nature of the ISP calls under section 251(b) of the 1996 Act was at the time in dispute, the 1998 Rhode Island agreement stated in section 5.7.2.3 (emphasis added):

> The Parties stipulate that they disagree as to whether traffic that originates on one Party's network and is transmitted to an Internet Service Provider ("ISP") connected to the other Party's network ("ISP Traffic") constitutes Local Traffic as defined herein, and the charges to be assessed in connection with such traffic. The issue of whether such traffic constitutes Local Traffic on which reciprocal compensation must be paid pursuant to the 1996 Act is presently before the FCC in CCB/CPD 97-30 and may be before a court of

-5-

competent jurisdiction. The Parties agree that the decision of the FCC in that proceeding, or as [sic] such court, shall determine whether such traffic is Local Traffic (as defined herein) and the charges to be assessed in connection with ISP Traffic. If the FCC or such court determines that ISP Traffic is Local Traffic, as defined herein, or otherwise determines that ISP Traffic is subject to reciprocal compensation, it shall be compensated as Local Traffic under this Agreement unless another compensation scheme is required under such FCC or court determination. Until resolution of this issue, [Verizon] agrees to pay [Global NAPs] Reciprocal Compensation for ISP Traffic (without conceding that ISP Traffic constitutes Local Traffic or precluding [Verizon's] ability to seek appropriate court review of this issue) pursuant to the Commission's Order in Case 97-C-1275, dated March 19, 1998, as such Order may be modified, changed or reversed.

Verizon objected to the adoption of the Rhode Island agreement in Massachusetts but, on a complaint by Global NAPs, the FCC held that Verizon was bound, under a commitment Verizon had made in exchange for the FCC's approval of the Bell Atlantic-GTE merger, to permit Global NAPs to adopt the entire Rhode Island agreement for use in Massachusetts, thereby superseding the 1997 agreement. Global NAPs, Inc. v. Verizon Commc'ns, 17 F.C.C.R. 4031, 4036 (2002).

Verizon then submitted the Rhode Island agreement to DTE for approval in Massachusetts but also asked DTE to determine whether under the newly adopted agreement the ISP calls were "local" and Verizon therefore owed reciprocal compensation to

-6-

Global NAPs for ISP calls delivered in Massachusetts between July 24, 2000 (the effective date of the agreement in Massachusetts) and June 14, 2001 (when the FCC adopted its own currently effective interim method of compensation in the ISP Remand Order, 16 F.C.C.R. 9151 (2001)).

DTE responded that the FCC's 1999 Internet Traffic Order had ended Verizon's obligation under the terms of section 5.7.2.3 (block quoted above). As already noted, the FCC had there held that ISP calls were not local calls triggering reciprocal compensation. This FCC ruling, DTE held, comprised "the decision of the FCC in that proceeding" anticipated by section 5.7.2.3. DTE then affirmed the 1998 agreement (so construed) as applying in Massachusetts. Adoption of Interconnection Agreement, D.T.E. No. 02-21, 2002 Mass. PUC Lexis 35, at *25 (Mass. D.T.E. June 24, 2002).

Global NAPs in turn sought judicial review in the federal district court in Massachusetts. 47 U.S.C. § 252(e)(6). On cross motions for summary judgment, the district court ultimately upheld the DTE's interpretation of the newly approved agreement as reasonable, giving deference to the agency's interpretation. Global NAPS, Inc. v. Verizon New England, Inc., 447 F. Supp. 2d 39, 41 (D. Mass. 2006).[4] Global NAPs now appeals to us.

---

[4]In an initial go-around, the district court held that Verizon was bound by a decision of the Rhode Island utilities commission construing the Rhode Island agreement language adversely to

Global NAPs' first argument is that under Massachusetts law the district court should have read the 1998 agreement de novo and not given DTE the benefit of the arbitrary and capricious standard. In federal practice, a regulatory agency gets some deference not only as to determinations of fact and policy, see Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997), but also in construing its own statute, Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984), and tariffs or agreements filed with it, Boston Edison Co. v. FERC, 441 F.3d 10, 12-13 (1st Cir. 2006).

The rationale for deference is that interpreting a carrier tariff or filed agreement is often informed by the agency's intertwined policy judgments and expertise. See Boston Edison, 441 F.3d at 16 (citing Sierra Club v. Larson, 2 F.3d 462, 469 (1st Cir. 1993)). Under the dual-regulation scheme adopted by the 1996 Act, interconnection agreements are reviewed and approved by the state agencies. Accordingly, the rationale favors deference to DTE in its interpretation of the Massachusetts interconnection agreement.

In response, Global NAPs says that in a Massachusetts court, DTE's reading of a contract is (absent extrinsic evidence) an issue of law subject to de novo review. Yet where a regulatory

Verizon. Global NAPs, Inc. v. Verizon New England, Inc., 332 F. Supp. 2d 341, 344 (D. Mass. 2004). This court reversed, ruling that DTE was entitled to make its own evaluation of the agreement as adopted in Massachusetts. Global NAPs, Inc. v. Mass. Dep't of Telecomms. & Energy, 427 F.3d 34, 48 (1st Cir. 2005).

filing is concerned, we think Massachusetts law does call for giving weight to DTE's interpretation. MCI Worldcom Commc'ns, Inc. v. Dep't of Telecomms. & Energy, 810 N.E.2d 802, 810 (Mass. 2004). So we need not decide whether, if Massachusetts practice were otherwise, we would follow Massachusetts. See generally Mich. Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc., 323 F.3d 348 (6th Cir. 2003).

Alternatively, Global NAPs argues that no deference is due here because the triggering event under section 5.7.2.3 is a decision by the "FCC or court," which Global NAPs characterizes as an issue of federal law.  But the primary question here is whether section 5.7.2.3 of the interconnection agreement, arguably ambiguous, is triggered by a specific FCC decision, whose own content is plain.  In construing the agreement, which DTE approved, DTE does get some deference under both federal and Massachusetts practice.

Turning then to the merits, Global NAPs says that it makes no sense to treat a vacated FCC decision--the Internet Traffic Order--as the awaited "FCC or court" "resolution" under section 5.7.2.3, even though the "not local" determination was thereafter reaffirmed on remand by the FCC.  Global NAPs urges that the reference to the FCC "or" court indicates that the parties did not intend that section 5.7.2.3 be triggered until final court

review of the FCC determination had been completed--a circumstance that has apparently not yet occurred.

The bare language of section 5.7.2.3 ("FCC or court"; "resolution") does not answer the interpretation question. Indeed, the parties in drafting section 5.7.2.3 likely did not think through all the permutations that could be presented by a FCC determination followed by further court review, remands, certiorari petitions, later modifications and the like. Neither side has pointed to any negotiations that focused on such variations. In reality, "interpretation" is often a matter of filling in gaps.

Here, sequence is informative. When the Rhode Island agreement was adopted in July 1998, the issue whether reciprocal compensation under section 251(b)(5) applied to ISP calls had been pending before the FCC for well over a year. The parties could have arbitrated reciprocal compensation issues before the relevant state agency; instead, in the Rhode Island agreement the parties effectively tied the obligation vel non to the forthcoming FCC order, Verizon agreeing to pay such compensation in the interim.

This context, and the identification in section 5.7.2.3 of the specific FCC docket that led to the Internet Traffic Order, focus attention on the ensuing FCC order which was (in a dictionary sense) a "resolution" of the "local" or not question. To call the FCC order a nullity (as Global NAPs does) because vacated and remanded for further explanation begs the question before us; the

issue is not whether the FCC order was remanded but whether its initial ruling, later reaffirmed and still in force, should be treated as a "resolution" of the issue within the meaning of section 5.7.2.3.

Of course, by the time Global NAPs sought to adopt the Rhode Island agreement for Massachusetts, the FCC had entered its Internet Traffic Order ruling that ISP calls were not local, and DTE had rejected the company's claim for compensation under the 1997 Massachusetts agreement. Nevertheless, adopting the 1998 Rhode Island agreement looks like a Hail Mary pass; Global NAPs might still hope that a reviewing court would read section 5.7.2.3 as favoring its position. But, like the district court, we do not.

Global NAPs next argues that even if the FCC order is more than a nullity and is a "resolution" of some sort, it cannot be treated as resolution of the crucial issue whether reciprocal compensation should be paid. Global NAPs says that the order merely decided that ISP calls were not "local" within the meaning of section 251; it did not forbid reciprocal compensation but acknowledged that carriers by agreement could require reciprocal compensation for such calls.

This may be a fair reading of what the FCC order said but not of the Massachusetts agreement. The agreement says that the issue whether ISP calls are "Local Traffic on which reciprocal compensation must be paid pursuant to the 1996 Act" is pending at

the FCC; that the answer of the FCC or a court will determine the issue; and if the FCC or court says yes, then such calls "will be compensated as Local Traffic under this agreement." The negative—that otherwise the agreement will not require such compensation—is clearly implied.

Quite possibly, a court might also deem "reasonable" a reading of section 5.7.2.3 that favored Global NAPs. For example, one might read the section's "or court" reference as calling for a "final" decision or resolution and mean by "final" one no longer subject to direct review—although the agreement has no such express language. Or Global NAPs could point to obvious unraveling problems in the event that the D.C. Circuit later concludes that ISP calls must be treated as falling within section 251.

Like courts, agencies—faced with cloudy contract language and a contingency that the parties may not have fully thought through—must do the best they can. Here, the DTE's decision can be squared with the language of section 5.7.2.3 and no linguistic solution offered by Global NAPs is more obviously correct. The history and timing also suggest that the parties were focusing on the FCC docket in question when they framed the language referring to an FCC decision.

Nor does DTE's outcome hint at unfairness. Whether or not Global NAPs engaged in deliberate arbitrage, the result it seeks in this case is simply to continue to obtain reciprocal

compensation past the date when the FCC ruled that it was not due under the statute. Section 5.7.2.3 made such a ruling controlling under the 1998 agreement as well. Even if DTE had never spoken to the issue, this would likely be the better reading.

In the final two paragraphs of its opening brief, Global NAPs notes the district court's statement that the agreement is "arguably susceptible to more than one meaning" and the fact that the district court (as we do) took account of historical context, as well as language, in construing the agreement. Then it says tersely that Global NAPs should have been afforded an opportunity for discovery and an evidentiary hearing.

Ambiguity does open the way for extrinsic evidence; many courts are even more welcoming. Nat'l Tax Inst. v. Topnotch at Stowe Resort & Spa, 388 F.3d 15, 20 (1st Cir. 2004); Baybank v. Vt. Nat'l Bank, 118 F.3d 30, 33 (1st Cir. 1997). But Global NAPs apparently never asked DTE for an opportunity to introduce other extrinsic evidence and, even on appeal, points to nothing that it would offer at such a hearing or could likely unearth in discovery.

In theory, Global NAPs' negotiation of the crucial language in the Rhode Island and companion agreements could have generated correspondence with Verizon or recollected discussions favorable to Global NAPs. If so, one would expect that Global NAPs would long since have proffered such materials to DTE or explained

why such materials were likely to exist but required discovery to wrest them from others.  It has not done so.

Affirmed.