442 Mass. 103 (2004) 103

MCI WorldCom Communications, Inc. *v.* Department of Telecommunications and Energy.

MCI WORLDCOM COMMUNICATIONS, INC.,[1] & another[2] *vs.*
DEPARTMENT OF TELECOMMUNICATIONS AND ENERGY
& another.[3]

Suffolk. April 5, 2004. - June 21, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Telecommunications Act. Telecommunications,* Interconnection agreements.
*Administrative Law,* Judicial review, Agency's interpretation of regulation.
*Words,* "Reciprocal compensation," "Local traffic."

Discussion of the statutory and regulatory provisions governing reciprocal
compensation among telephone service companies for the cost of local
calls requiring interconnections between their respective networks.
[104-107]
The Department of Telecommunications and Energy (department), in analyz-
ing an agreement between two telephone service companies, did not err in
finding that portions of the agreement were intended to track Federal law,
and that therefore calls from computers to Internet service providers requir-
ing interconnection between the two companies were not local calls, and
the costs of those calls were thus ineligible for reciprocal compensation
under 47 U.S.C. § 251(b)(5) of the Telecommunications Act of 1996
[112-114]; further, the department had adequate grounds to reconsider, due
to a misunderstanding of Federal law, an order it had issued earlier, which
had offered a different rationale for the conclusion that calls to Internet
service providers were not local in nature [114-116], and did not render an
arbitrary or capricious decision by failing to consider the plaintiff's cause
of action for quantum meruit [116].

CIVIL ACTION commenced in the Supreme Judicial Court for
the county of Suffolk on January 9, 2003.

The case was reported by *Cordy,* J.

*William J. Rooney, Jr. (Jeffrey C. Melick* with him) for Global
NAPs, Inc.

[1]As successor in interest to MFS Intelenet of Massachusetts, Inc.

MCI has apparently settled with Verizon since the single justice reserved
and reported this matter, and has voluntarily dismissed its appeal.

[2]Global NAPs, Inc. (Global), intervener.

[3]Verizon New England, Inc., doing business as Verizon Massachusetts (Ve-
rizon), intervener.

*Daniel J. Hammond,* Assistant Attorney General, for Department of Telecommunications and Energy.

*Scott Angstreich* (*Keefe B. Clemons* with him) for Verizon New England, Inc.

*Eric J. Krathwohl, James T. Finnigan, & Michael Tenore,* for RNK, Inc., amicus curiae, submitted a brief.

COWIN, J. On December 20, 2002, the Department of Telecommunications and Energy (department), pursuant to a remand order of the Federal District Court, see *Global NAPs, Inc.* v. *New England Tel. & Tel. Co.,* 226 F. Supp. 2d 279, 281 (D. Mass. 2002) (*Global NAPs*),[4] conducted a "contract analysis" of an "interconnection agreement" between MCI WorldCom Communications (MCI) and Verizon New England (Verizon) (MCI agreement).[5] See D.T.E. 97-116-G at 26 (2002) (2002 department order). The department concluded that the parties had intended that certain portions of the MCI agreement track Federal law, and therefore that Verizon was not obligated to pay "reciprocal compensation" to MCI, Global NAPs (Global), and other companies that had entered into similar agreements with Verizon. *Id.* at 31. MCI and Global appealed pursuant to G. L. c. 25, § 5. A single justice of this court reserved and reported the matter without decision to the full court. We affirm the decision of the department.

*Background.* Because the context of this case is complex, we begin with an overview of the relevant statutory and regulatory provisions that govern this proceeding. Until the 1990's, the provision of local telephone service was not competitive. Individual telephone companies, sometimes called "incumbent local exchange carriers" (ILECs), maintained monopolies over defined geographic areas. See *Global NAPs, supra* at 285, and cases cited. In an effort to dispense with these monopolies and introduce competition into the market, Congress passed the

[4]The case was filed in the United States District Court for the District of Massachusetts pursuant to 47 U.S.C. § 252(e)(6) (2000) which provides, in relevant part, that "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court . . . ."

[5]These parties are successors in interest to MFS Intelenet of Massachusetts, Inc., and the New England Telephone and Telegraph Company, respectively. For ease of reference, we will use only the parties' current names throughout.

Telecommunications Act of 1996 (Act), Pub. L. 104-104, 110 Stat. 56 (codified in part at 47 U.S.C. §§ 251-261 [2000]). See *Pacific Bell* v. *Pac-West Telecomm, Inc.*, 325 F.3d 1114, 1118 (9th Cir. 2002) (Congress sought to foster competition "by neutralizing the competitive advantage inherent in [ILECs] ownership of the physical networks required to supply telecommunications services"). Toward that end, the Act required that ILECs enter into "interconnection agreements" with their new competitors, the "competing local exchange carriers" (CLECs). See 47 U.S.C. § 251 (a), (c) & § 252. These agreements set forth the terms by which the ILECs and CLECs would interconnect their networks. In plain English, the requirement of interconnection agreements simply assured that, for example, a Verizon customer could call an MCI customer who resided within the same local calling area, and vice versa.[6] The Act gave State commissions, such as the department, authority to approve or reject the agreements, and to resolve disputes between the parties. 47 U.S.C. § 252 (a), (b), (e). See *BellSouth Telecom., Inc.* v. *MCIMetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1275-1276 (11th Cir. 2003) (State commissions have authority to interpret and enforce interconnection agreements).

When two local telephone service networks are interconnected, the issue of costs must be resolved. For example, when a Verizon customer initiates a call to an MCI customer in the same calling area, both Verizon and MCI bear certain costs associated with originating and "terminating" (or completing) the call. However, only the originator, the Verizon customer, pays for the call; the MCI customer does not pay a fee to receive the call, and thus MCI is not compensated for those costs. See *Illinois Bell Tel. Co.* v. *Worldcom Techs., Inc.*, 179 F.3d 566, 568 (7th Cir. 1999), cert. denied, 535 U.S. 1107 (2002). To correct this imbalance, the Act mandated that interconnection agreements must provide for "[r]eciprocal compensation" for local

---

[6]Title 47 U.S.C. § 251 (a)(1) (2000) provides that "[e]ach telecommunications carrier has the duty . . . to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers . . . ."

calls. 47 U.S.C. § 251 (b)(5).[7] In our example, this means that the originating customer pays Verizon for the call in her monthly bill, and then Verizon compensates MCI for MCI's costs in terminating that call.[8] The basic assumption behind reciprocal compensation is that it would be roughly balanced, that is, neither company would receive a windfall of compensation. See *New England Tel. & Tel. Co.* v. *Conversent Communications of R.I., L.L.C.*, 178 F. Supp. 2d 81, 85 (D.R.I. 2001), and cases cited.

In the years since Congress passed the Act, however, there has been a dramatic rise in Internet usage and concomitant increase of telephone calls to Internet service providers (ISPs). See *Pacific Bell* v. *Pac-West Telecomm, Inc.*, *supra* at 1118. Calls to ISPs (ISP-bound traffic) are primarily one way (ISP server computers tend not to call back), and on average are of greater duration than traditional telephone phone calls. See *id.*; *New England Tel. & Tel. Co.* v. *Conversent Communications of R.I., L.L.C.*, *supra* at 85. As a result, a company with many customers that are ISPs is likely to receive more compensation from carriers with few or no customers that are ISPs. It has been suggested by other courts that some CLECs have targeted ISPs as customers in order to take advantage of this phenomenon. *Id.*

Because reciprocal compensation is available only for local calls, whether ISP-bound traffic is deemed "local" is an important question. If a customer's call to a local ISP is considered as terminating at the ISP server, then it is local and subject to reciprocal compensation. *Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 14 F.C.C.R. 3689, 3694 (1999) (*Internet Traffic Order*). However, if the call is considered as terminating somewhere on the Internet, for example, at a website that the customer visits after calling her ISP, then the call is not local and not subject to reciprocal compensation. *Id.* The question of

---

[7]Title 47 U.S.C. § 251 (b)(5)(2000) establishes a duty on the part of local telephone service providers to "establish reciprocal compensation arrangements for the transport and termination of telecommunications."

[8]For instance, the MCI agreement at issue in this case provides for MCI and Verizon to pay each other $.008 a minute for local calls between their respective networks for the first six months of the agreement.

the characterization of ISP-bound traffic underlies the dispute in this case.

There is no disagreement about the essential facts. Before the passage of the Act, Verizon was the ILEC for eastern and central Massachusetts, and enjoyed a monopoly over the provision of local telephone service in that region. After passage of the Act, MCI entered the market as a CLEC. On June 26, 1996, MCI and Verizon signed an interconnection agreement (MCI agreement), providing for the interconnection of their respective local networks.

Section 5.81 of the MCI agreement provides that "reciprocal compensation only applies to the transport and termination of [l]ocal [t]raffic," which a customer originates on one network for termination on the other party's network. Section 5.82 provides that "[t]he [p]arties shall compensate each other for transport and termination of [l]ocal [t]raffic . . . ." "Local [t]raffic" is defined by § 1.38 as "a call which is originated and terminated within a given [local access and transport area], in the Commonwealth of Massachusetts, as defined in DPU Tariff 10, Section 5." Section 1.53 provides that " '[r]eciprocal [c]ompensation' is [a]s [d]escribed in the Act, and refers to the payment arrangements that recover costs incurred for the transport and termination of [t]elecommunications originating on one [p]arty's network and terminating on the other [p]arty's network." "As [d]escribed in the Act" is defined "as described in or required by the Act and as from time to time interpreted in the duly authorized rules and regulations of the FCC or the [d]epartment." § 1.6. There is no provision in the MCI agreement that explicitly addresses whether ISP-bound traffic is "local" or subject to reciprocal compensation.

After the agreement was approved by the department, Verizon and MCI paid each other reciprocal compensation for calls originating on one network and terminating on the other, including ISP-bound traffic. In April of 1997, Verizon unilaterally discontinued reciprocal compensation payments to MCI for ISP-bound traffic, on the basis that these calls were interstate and not local. At approximately the same time, Verizon entered into negotiations with Global, another CLEC. Global and Verizon were unable to come to terms on whether ISP-bound traffic

would be subject to reciprocal compensation, and ultimately agreed that the provisions of the MCI agreement (and the resolution of the dispute between Verizon and MCI), would govern that aspect of their agreement. *Global NAPs, supra* at 290. *Global NAPs, Inc.* v. *FCC*, 291 F.3d 832, 834 (D.C. Cir. 2002). Global and Verizon entered into an interconnection agreement (Global agreement) on April 15, 1997.[9] That same day, Verizon sent a letter to Global, explaining Verizon's position that ISP-bound traffic is not subject to reciprocal compensation, and that the Global agreement would be treated in the same manner as agreements with other CLECs.

On June 26, 1997, MCI filed a petition with the department alleging that Verizon had breached the MCI agreement by refusing to pay reciprocal compensation for ISP-bound traffic. Global and other CLECs intervened in support of MCI. After a hearing, the department concluded that ISP-bound traffic was "local," and therefore subject to reciprocal compensation. D.T.E. 97-116 at 13 (1998) (1998 department order). The reasoning behind the 1998 order was twofold. First, the department concluded that ISP-bound traffic came under the definition of "[l]ocal [t]raffic" in the MCI agreement, because it was identical to traditional local calling in many important respects (including billing and dialing), and because the premises of the originating and receiving callers were in the same local region. *Id.* at 11. Second, the department looked to rulings of the Federal Communications Commission (FCC), and found the FCC had implicitly accepted the "two-call" theory, under which ISP-bound traffic is comprised of two separate services: (1) a local call to an ISP server, and (2) a subsequent (possibly interstate) communication from the ISP to the Internet. *Id.* at 11-12, citing In the Matter of Federal-State Joint Board on Universal Service, Report Order, FCC Docket No. 96-45 at 1789 (May 8, 1997). The department acknowledged, however, that "the FCC may make a determination . . . that could require us to modify our findings in this Order." *Id.* at 5 n.11.

In 1999, the FCC issued the *Internet Traffic Order, supra,* a declaratory ruling that definitively rejected the two-call theory

---

[9]The Global agreement is identical to the MCI agreement in all aspects relevant to this case.

in favor of an "end to end analysis," which concluded that ISP-bound traffic was primarily interstate in nature, and not local, because it does "not terminate at the ISP's local server . . . but continue[s] to the ultimate destination or destinations, specifically at an Internet website that is often located in another state." *Internet Traffic Order, supra* at 3697. The FCC went on to say, however, that because it had not yet adopted a rule specifically addressing whether ISP-bound traffic was subject to reciprocal compensation, parties were still bound by the terms of their interconnection agreements. *Id.* at 3703. The FCC found "no reason to interfere with state commission findings as to whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic," and therefore State commissions could apply "contractual principles or other legal or equitable considerations" and impose reciprocal compensation on ISP-bound traffic, and "[b]y the same token . . . [were] also . . . free not to require the payment of reciprocal compensation for this traffic . . . ." *Id.* at 3703-3706. The FCC recommended that decisions by State commissions concerning whether to revisit prior decisions should depend on the bases underlying those decisions. *Id.* at 3706.

On the heels of the *Internet Traffic Order*, Verizon moved for the department to modify the 1998 department order. The department allowed Verizon's motion, reasoning that because its 1998 department order was based exclusively on a mistake of law, i.e., the two-call theory, it was now "as a practical matter — a nullity." D.T.E. 97-116-C at 24 (1999) (1999 department order). The department vacated its 1998 order, thereby freeing Verizon from paying reciprocal compensation for ISP-bound traffic. *Id.* at 40-41.

That could have ended the matter, but in March, 2000, the United States Court of Appeals for the District of Columbia Circuit vacated and remanded the *Internet Traffic Order* for want of reasoned decision-making. *Bell Atl. Tel. Cos.* v. *FCC*, 206 F.3d 1, 3 (D.C. Cir. 2000). Shortly thereafter, Global, joined by MCI and other CLECs, moved for the department to vacate the 1999 department order and reinstate the original 1998

department order.[10] The department refused, on the grounds that the two-call theory was no longer viable, that the remand order by the District of Columbia Circuit Court did not require the FCC to find that ISP-bound traffic was local, and that it was "impractical for the [department] . . . to career back and forth with alternating decisions on the very issue even now under review by the FCC." D.T.E. 97-116-E at 15 (2000).

In 2001, the FCC issued another ruling, once again concluding that ISP-bound traffic was not subject to reciprocal compensation under the Act, but basing that conclusion on a different analysis. *Matter of Implementation of the Local Competition Provisions in Telecommunications Act of 1996*, 16 F.C.C.R. 9151, 9154 (2001) (*Order on Remand*). The FCC adopted the theory that ISP-bound traffic was "information access" traffic under 47 U.S.C. § 251 (g), and thus exempt from the reciprocal compensation provision of 47 U.S.C. § 251 (b)(5). *Id.*[11,12] The Federal court once again rejected the reasoning of the FCC, and remanded, but did not vacate, the *Order on Remand. Worldcom, Inc.* v. *FCC*, 288 F.3d 429, 434 (D.C. Cir. 2002).[13]

Meanwhile, MCI and Global brought their complaint to the Federal District Court, pursuant to 47 U.S.C. § 252 (e)(6). See note 3, *supra.* MCI and Global requested a declaration that the orders subsequent to the original 1998 department order were in violation of Federal law, and that the original 1998 department

---

[10]Global's motion also sought vacatur of D.T.E. 97-116-D (2000), which had affirmed the 1999 department order.

[11]The FCC established a transitional cost-recovery mechanism for interconnection agreements entered into after the effective date of its order, see *Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 16 F.C.C.R. 9151, 9155-9156 (2001) (*Order on Remand*), but stated that this new system would not affect or preempt State commission decisions regarding reciprocal compensation for periods prior to that date. *Id.* at 9189.

[12]The department requested comments on the effect of the *Order on Remand.* See D.T.E. 97-116-F at 5 (2001). Once again, the department rejected the CLECs' request to reinstate the original 1998 department order. *Id.* at 11.

[13]The FCC proceedings are still pending on remand and the *Order on Remand* remains in effect. See *Pacific Bell* v. *Pac-West Telecomm, Inc.*, 325 F.3d 1114, 1122-1123 (9th Cir. 2002).

order "remains in full force and effect."[14] *Global NAPs, supra* at 282-283. The court concluded that, while the original 1998 department order complied with Federal law, the 1999 department order (as well as subsequent orders affirming it) violated Federal law because it failed to consider whether ISP-bound traffic was subject to reciprocal compensation under the agreement as a matter of contract interpretation. *Id.* at 280, 294. The court noted that the department had reversed its order based merely on the *Internet Traffic Order*, which expressly stated that it was not intended to be used as a foundation for overturning prior decisions of State regulatory commissions. *Id.* at 294. The court opined that the department "may have acted properly in reconsidering in light of the FCC's ruling," but that it was not excused from considering whether the contractual terms of the agreement itself gave rise to reciprocal compensation. *Id.* The court remanded the matter to the department. *Id.* at 281.

Pursuant to the remand instructions, the department conducted a "contract analysis" of the agreement. D.T.E. 97-116-G at 26 (2002). The department concluded that the plain language of the agreement, which tied the definition of "reciprocal compensation" to the construction of the Act "as from time to time interpreted" by the FCC, manifested an intent of the parties to the agreement to track the FCC's interpretation of the scope of 47 U.S.C. § 251 (b)(5), the Act's reciprocal compensation provision. *Id.* at 28. Therefore, what the FCC has determined is compensable under the act is what is compensable under the agreement. *Id.* Because only local traffic is compensable under the agreement, and the FCC has consistently ruled since 1999 that ISP-bound traffic is not local, ISP-bound traffic did not fit within the agreement's definition of local, and was not subject to reciprocal compensation. *Id.* at 28-29. It is from this decision that Global now appeals, claiming several errors of law.

*Standard of review.* The standard of review for petitions under G. L. c. 25, § 5, is well settled: "[A] petition that raises no constitutional questions requires us to review the department's findings to determine only whether there is an error of law. . . .

---

[14]MCI also requested injunctive relief, which was not granted. *Global NAPs, Inc.* v. *New England Tel. & Tel. Co.,* 226 F. Supp. 2d 279, 280, 282 (D. Mass. 2002).

The burden of proof is on the appealing party to show that the order appealed from is invalid, and we have observed that this burden is heavy. . . . We shall uphold an agency's decision unless it is based on an error of law, unsupported by substantial evidence, unwarranted by facts found on the record as submitted, arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. G. L. c. 30A, § 14 (7)." (Citations omitted.) *Massachusetts Inst. of Tech.* v. *Department of Pub. Utils.*, 425 Mass. 856, 867-868 (1997).

Moreover, where a case involves interpretation of a complex statutory and regulatory framework, "[w]e give great deference to the department's expertise and experience in areas where the Legislature has delegated to it decision making authority." *Stow Mun. Elec. Dep't* v. *Department of Pub. Utils.*, 426 Mass. 341, 344 (1997), quoting *Wolf* v. *Department of Pub. Utils.*, 407 Mass. 363, 367 (1990). Where the FCC has expressly delegated authority to the department, we have accorded deference to the department's interpretation of that delegation. *MCI Telecom. Corp.* v. *Department of Telecom. & Energy*, 435 Mass. 144, 151 (2001). This case presents a situation that is not merely the usual occasion for deference to a State agency. Here, Congress has explicitly delegated the authority to interpret and enforce interconnection agreements to the department. See 47 U.S.C. § 252 (e).

*Discussion.* Global argues that the department erred in its interpretation of the agreement. Global contends that § 5.8.2 of the agreement, which requires that the parties compensate each other for the transport and termination of "[l]ocal [t]raffic," makes no reference to reciprocal compensation. It further argues that the agreement's definition of "[l]ocal [t]raffic" is express, so that a complete understanding of the term does not require the department to look to Federal law. Therefore, the argument goes, the definition of "[l]ocal [t]raffic," and the requirement that it be compensable, is somehow insulated from the definition of "reciprocal compensation," which expressly tracks Federal law. We disagree.

To ascertain the intent of contracting parties, the court considers the words used by the parties, the agreement taken as a whole and the surrounding facts and circumstances. *Mas-*

442 Mass. 103 (2004)                                                    113

MCI WorldCom Communications, Inc. *v.* Department of Telecommunications and Energy.

*sachusetts Mun. Wholesale Elec. Co.* v. *Danvers*, 411 Mass. 39, 45-46 (1991). See *USM Corp.* v. *Arthur D. Little Sys., Inc.*, 28 Mass. App. Ct. 108, 116 (1989), and cases cited (court must "construe contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose"). The MCI agreement, in context, is not only closely associated with the Federal regulatory scheme, but its very existence is mandated by that scheme, specifically by 47 U.S.C. § 251 (b)(5). Many of the provisions of interconnection agreements "represent nothing more than an attempt to comply with the requirements of the 1996 Act." *AT&T Communications of the S. States, Inc.* v. *BellSouth Telecom., Inc.*, 229 F.3d 457, 465 (4th Cir. 2000). Even when the provisions of the agreement are voluntarily negotiated, they are "cabined by the obvious recognition that the parties to the agreement had to agree within the parameters fixed by the federal standards set out in 47 U.S.C. §§ 251 and 252." *BellSouth Telecom., Inc.* v. *MCIMetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1281 (11th Cir. 2003).

Against this backdrop, the parties to the MCI agreement explicitly tied the definition of "reciprocal compensation" to the FCC's interpretation of the Act, i.e., the FCC's interpretation of the scope of 47 U.S.C. § 251 (b)(5), and expressly contemplated that interpretation changing "from time to time." § 1.6. Section 5.8.1, in turn, limited reciprocal compensation to local traffic. Section 5.8.2 does not specifically mention "reciprocal compensation," but addresses compensation for the termination of local traffic, and resides in the section of the agreement addressing reciprocal compensation.[15] Taking into account the context of the agreement and the deference accorded to the department, we conclude that the department did not err

---

[15]It has been pointed out that the department used the heading of § 5.8, "Reciprocal Compensation Arrangements — Section 251(b)(5)" to tie §§ 5.8.1 and 5.8.2 to the Federal statute, despite § 2.0 of the agreement, which states that section headings are not intended to "be a part of or to affect the meaning of this Agreement." We do not view this error as fatal to the department's reasoning, and at any rate, a prohibition against considering section headings does not require that we ignore the context and placement of individual provisions within the over-all agreement. Section 2.0 certainly does not require this court to conclude that §§ 5.8.1 and 5.8.2 have nothing to do with 47 U.S.C. § 251 (b)(5).

in finding that the plain language of the agreement ties "[l]ocal [t]raffic" to the scope of "reciprocal compensation" under 47 U.S.C. § 251 (b)(5), as interpreted by the FCC.[16] In other words, we are satisfied that what is reciprocally compensable under Federal law is what was intended to be reciprocally compensable under the MCI agreement.

Global further argues that even if the agreement manifests an intention to track Federal law and FCC interpretations, the state of Federal law is still "an open question," and therefore the department erred in its interpretation of that law. Global's frustration at the shifting FCC rationale for its rulings is understandable, but we conclude that the department did not err. Prior to the *Internet Traffic Order*, the FCC had treated ISP-bound traffic as local and not interstate, at least for some purposes. See *Internet Traffic Order, supra* at 3703. However, since that ruling, the FCC has consistently concluded that ISP-bound traffic is not local and not subject to reciprocal compensation. See *Order on Remand, supra* at 9154. Neither of the remand orders of the Federal court expressly rejected this underlying premise. See *Worldcom, Inc.* v. *FCC*, 288 F.3d 429, 434 (D.C. Cir. 2002); *Bell Atl. Tel. Cos.* v. *FCC*, 206 F.3d 1, 9 (D.C. Cir. 2000). The FCC's *Order on Remand* was remanded but not vacated, and is still in effect. *Worldcom, Inc.* v. *FCC, supra*. See note 12, *supra*. Therefore, the department was justified in concluding that under Federal law, ISP-bound traffic is not within the scope of the reciprocal compensation statute.

Global also contends that the department had no grounds to reconsider its original 1998 order, once the Massachusetts Federal District Court declared that said order complied with Federal law. See *Global NAPs, supra* at 280. Global further maintains that the "extraordinary circumstances" necessary for reconsideration were not present in this case, and further that

---

[16]Global also argues that the reference to tariffs in the agreement's definition of "local traffic" manifests an intent to pay reciprocal compensation for any call that is billed as "local." We read this reference as a geographical description only. To argue that the definition of "[l]ocal [t]raffic" is tied exclusively to how Verizon bills these calls pursuant to regulatory schemes ignores the context of the agreement and the fact that to be "local" by the terms of the agreement, a call must "originate[]" and "terminate[]" within a defined geographical area.

the reconsideration lacked "reasoned consistency." See *Boston Gas Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 104 (1975). We conclude that the department did not err in reconsidering its 1998 order.

The department correctly noted that the Federal District Court did not merely remand the matter for the "ministerial" task of reinstating the 1998 order. D.T.E. 97-116-G at 23 (2002). The court remanded the matter in order for the department to determine "whether the interconnection agreements give rise to reciprocal compensation as a matter of Massachusetts contract law," and explicitly stated that the department was "not required to reach the same result it reached in the 1998 [department order]." *Global NAPs, supra* at 294. It did not, nor could it, order that the 1998 department order be reinstated, but merely pointed out that in 1998 the department had conducted the proper analysis under Federal law. *Id.* at 295 & nn.20, 21.

As for reconsideration of the 1998 department order, the department recognizes "extraordinary circumstances" necessary to modify a prior decision "when a motion for reconsideration brings to light previously unknown or undisclosed facts which, if known, would have had a significant impact upon the decision already rendered," and "when argument contained within a motion for reconsideration demonstrates that the Department's treatment of an issue was the result of mistake or inadvertence." MCI WorldCom, Inc., D.T.E. 97-116-D at 17-18 (2000), and cases cited.[17] The department did not err in considering their earlier misunderstanding of Federal law as adequate grounds for reconsideration and modification of the 1998 department order. D.T.E. 97-116-G at 29 (2002).[18]

Global is correct in arguing that it has a right "to expect and

---

[17]Global argues that the 2002 department order does not explicitly address any ground for reconsideration. However, to the extent that it is a reconsideration of the 1998 department order, it implicitly incorporates the "mistake or inadvertence" rationale of its earlier reconsideration, the 1999 department order.

[18]RNK, Inc., in an amicus brief argues that the 1998 department order satisfies the requirements of res judicata and should therefore be given preclusive effect. Global did not raise this argument, and we ordinarily do not consider nonjurisdictional issues raised only by an amicus. *Massachusetts Correction Officers Federated Union* v. *Labor Relations Comm'n*, 417 Mass. 7, 9 (1994).

obtain reasoned consistency in the agency's decisions." *Boston Gas Co.* v. *Department of Pub. Utils.*, *supra* at 104. However, this does not mean that the department may never deviate from its original position, only that any such change must be explained. *Robinson* v. *Department of Pub. Utils.*, 416 Mass. 668, 673 (1993). In both the 1998 order and the 2002 order, the department consistently looked to Federal law and the terms of the contract. The department's changing interpretation stems from the fact that Federal law, which the agreement tracks, had been in a state of flux, a potential circumstance expressly recognized by the agreement. Indeed, the 1998 order recognized that its analysis rested on imprecise analogies to FCC rulings that were not directly on point, and predicted that subsequent FCC rulings might necessitate modification of its findings. D.T.E. 97-116 at 5 n.11 (1998).

Finally, Global argues that the decision in the 2002 order was arbitrary and capricious because the department failed to consider "other legal or equitable considerations." D.T.E 97-116-G at 26 (2002). Specifically, Global contends that it has a cause of action sounding in quantum meruit, that is, for the recovery of the fair value of the services it is providing to Verizon by carrying ISP-bound traffic originated by Verizon customers and continuing on to Global's network.

The department's decision was not arbitrary or capricious. In its 2002 order, the department contemplated the possibility of other legal or equitable considerations. *Id.* at 27 n.18. It concluded that, because the plain language of the agreement provided for the treatment of ISP-bound traffic, further discussion of these considerations was not necessary. *Id.* The department did not err. Verizon argues that Global failed to raised quantum meruit as a theory of recovery before the department. See *Lincoln* v. *Personnel Adm'r of the Dep't of Personnel Admin.*, 432 Mass. 208, 213 n.6 (2000) (argument not raised with Civil Service Commission is waived). But even had the issue been raised, the provisions of the express contract address the disputed issue, and "[r]ecovery in quantum meruit presupposes that no valid contract covers the subject matter of a dispute." *Boswell* v. *Zephyr Lines, Inc.*, 414 Mass. 241, 250 (1993).

The decision of the Department of Telecommunications and Energy is affirmed.

*So ordered.*