Lauriat, Peter M., J.
This action arises from a failed business relationship between plaintiff Wayne Chang (“Chang”) and defendants Cameron and Tyler Winklevoss (the “Winklevosses”), Howard Winklevoss, and Divya Narenda, founders and/or officers, directors, and/or shareholders of defendant ConnectU, Inc., f/k/a ConnectU, LLC (collectively, the “Winklevoss defendants” unless otherwise indicated). Defendants Scott R. Mosko (“Mosko”) and Finnegan, Henderson, Farabow, Garrett & Dunner (“Finnegan”) defended Chang in a California lawsuit. Now before the court are the Winklevoss defendants’ motion to dismiss the present action for lack of subject matter jurisdiction and failure to state a claim or, alternatively, for a stay; Finnegan’s and Mosko’s motions to dismiss for lack of subject matter jurisdiction and failure to state a claim; and Mosko’s motion to dismiss for lack of personal jurisdiction.
For the reasons set forth below, the Winklevosses’ motion is allowed in part and denied in part; Finnegan’s and Mosko’s motions are allowed; and Mosko’s motion is denied as moot.
BACKGROUND
The court takes as true the following facts set forth in Chang’s complaint, see Marshall v. Stratus Pharms., Inc., 51 Mass.App.Ct. 667, 670-71 (2001), with a recitation of additional facts as they pertain to subject matter jurisdiction. In 2003, Chang developed a peer-to-peer, file sharing computer software called i2hub, which quickly became popular among college students when launched in 2004. The Winklevosses and Nar-enda were the founders of ConnectU, a social networking site trying to compete with Facebook. The Winklevosses contacted Chang in October 2004, seeking to form a partnership and to integrate ConnectU and i2hub, with the goal of increasing ConnectU’s user base.
On October 21, 2004, Cameron Winklevoss (“Cameron”) sent Chang an email stating that ConnectU and i2hub would operate as a partnership. A series of email discussions followed concerning the integration of the entities and the ownership of several other internet-based operating companies. At a November 13, 2004, meeting, Chang and the Winklevosses agreed that, as compensation for his work on the integration, Chang would, upon its completion, own 15% of ConnectU. They also agreed to form a partnership, called the *323 Winklevoss Chang Group (“WCG”) to jointly promote the integrated ConnectU and i2hub program, as well as to develop other internet-based concepts. Chang asserts that Cameron, in subsequent instant messages, confirmed this arrangement. On November 23, 3004, Cameron emailed Chang a Memorandum of Understanding (“Memorandum”) which stated, in pertinent part: “Upon completion of the integration, CU [ConnectU] will give Wayne Chang the option to exercise a 15% stake in CU.” Chang accepted these terms on November 24, 2004.
During the next several months, according to the complaint, Chang and i2hub worked to complete the integration. In addition, Chang and the Winklevosses began operating as WCG, holding themselves out as partners in the development of ConnectU, i2hub,and other internet properties. Chang contributed i2hub’s software, network, users and all other assets; the Winklevoss defendants contributed ConnectU, the ConnectU.com website and all other assets. Chang claims he was directly involved in the management and operation of ConnectU as part of WCG, and that the parties agreed that he held a 50% interest in WCG. After the integration, revenue previously generated by i2hub was redirected to ConnectU.
Separate and apart from the integration, Chang, as part of WCG’s business, co-invented a method and system for purchasing music files and other digital goods through affinity programs, and assisted in drafting an associated patent application, U.S. Patent Application No. 20060212395. The Winklevosses and Howard Winklevoss filed the application without listing Chang as a co-inventor. Chang also worked on additional websites and projects as part of WCG’s operations, including, but not limited to, Jungalu.com; StallScribbles.com; ConnectHi; Connect Groups; the Winklevoss Chang Representative Program, designed to promote ConnectU and other WCG properties; and Social Butterfly, a feature added to ConnectU to enable users to consolidate their accounts at various social networking sites, and to make that information available through ConnectU. Any revenue generated from these sites was directed to ConnectU’s operating account.
Chang claims that he successfully completed the integration of i2hub and ConnectU in February 2005, and WCG released the integrated software in March 2005. It directed all i2hub users to register as ConnectU users and provided them with access to ConnectU through the i2hub interface. During the integration process and thereafter, Chang and the Winklevosses together attended meetings with potential contributors, promoted the various programs both on the web and in print advertisements, set rates, and issued a press release identifying a number of “our” products.
The relationship quickly deteriorated, in large part due to a dispute in April 2005, over a contribution of $7500 that the Winklevosses initially provided WCG, which they claimed entitled them to an additional 5% of the company. Matters went downhill from there. The Winklevosses informed Chang that they were no longer funding WCG, and were terminating their relationship with Chang, thus effectively dissolving the company. In late 2005, they told Chang he was responsible for $4000 owed to an advertiser, Pioneer Valley Transportation Authority, claimed he owed additional money, and threatened legal action.
While the above events were unfolding, ConnectU and the Winklevoss defendants were embroiled in legal actions with respect to Facebook. On September 2, 2004, ConnectU filed an action in the United States District Court for the District of Massachusetts, ConnectU, LLC v. Mark Zuckerberg et al., No. 04-CV-111923 DPW, asserting misappropriation of trade secrets (the “Massachusetts action”). Chang was not a party to that action. On September 20, 2005, Facebook brought an action against ConnectU and the Winklevoss defendants in California state court, alleging that the use of Social Butterfly misappropriated Facebook’s proprietary information and user data. It was later removed to the United States District Court for the Northern District of California, captioned The Facebook, Inc. v. ConnectU, Inc. et al., No. C 07-01389 JW (the “California action”).
The Winklevoss defendants and ConnectU retained defendants Mosko and Finnegan to defend them in the California action. After Chang’s name came to light during discovery, Facebook noticed his deposition to take place in Boston on March 22,2007; the subpoena requested that Chang bring with him certain documents. Chang then contacted Mosko asking advice with respect to the subpoena, and Mosko agreed to represent Chang regarding the subpoena and deposition only. The deposition never took place and no documents were produced. Facebook then amended its complaint in the California action to add Chang as a defendant, and Mosko agreed to represent Chang in that action. The Winklevosses and Howard Winklevoss arranged and paid for Chang’s representation. Chang asserts that Mosko and Finnegan were aware of both the Memorandum and his partnership in WCG, entitling him to an interest in ConnectU. Nonetheless, he asserts they never discussed with him any potential claims against ConnectU or the Winklevoss defendants.[1]
On January 29, 2008, Mosko told Chang that Facebook had requested mediation of all outstanding disputes and claims. At a February 22, 2008 mediation meeting attended by Mosko, Facebook and ConnectU reached a global settlement with respect to all pending litigation between the parties. Chang asserts that Mosko never informed him of the time or place of the mediation meeting or the terms of the settlement agreement. Pursuant to a Term Sheet & Settlement Agreement (the “settlement agreement”) *324 executed by the parties, Facebook received 100% of ConnectU’s common stock in exchange for the payment of $20,000 in cash and approximately 1,253,326 shares of Facebook common stock for a total value of about $65,000,000. Both the California and Massachusetts actions were dismissed with prejudice, including all claims against Chang in the California action in consideration of the above payment.
The settlement eventually fell apart and Facebook filed a motion to enforce the settlement in the District Court. See The Facebook, Inc., v. Pacific Northwest Software, Inc., 2011 WL 1346951 at *1 (9th Cir. April 11, 2011). The District Court found the settlement enforceable and ordered the Winklevoss defendants to transfer all ConnectU shares to Facebook. Id. At that point ConnectU had essentially switched sides and had no interest in appealing the District Court’s order. Id. The Winklevoss defendants, however, contended that material terms of the settlement agreement were either missing or not agreed upon, and that it was fraudulently obtained. On August 11, 2008, they filed a notice of appeal to the United States Court of Appeals for the Ninth Circuit. On November 21, 2008, the District Court issued an amended judgment in favor of Facebook, ordered that all shares of ConnectU be transferred to Facebook, and that the cash as well as the Facebook common shares be transferred to ConnectU’s counsel, Boies, Schiller & Flexner, LLP (“BSF”), to be held “in trust for its clients and any lawful claimant.” Petrella Aff. Ex. E.[2] By order dated December 15, 2008, the District Court dismissed all claims against ConnectU and Chang with prejudice. On April 11, 2011, the Ninth Circuit affirmed the District Court’s decision to enforce the settlement agreement. Id. at *7.
Chang filed the present action on December 21, 2009, asserting claims against the Winklevoss defendants, ConnectU, Mosko and Finnegan.[3] The gist of his claim against the Winklevoss defendants and ConnectU is that by virtue of his 50% share in WCG he is entitled to 50% of the sale of ConnectU, or 50% of the proceeds of the settlement agreement. In the alternative, he argues, he is entitled to 15% of the proceeds pursuant to the Memorandum. With respect to Mosko and Finnegan, he claims that they failed to allow him to participate in the settlement proceedings, conspired with the Winklevoss defendants to deprive him of his interest in the proceeds thereof, and breached their duty to represent his interests.[4]
The defendants have all moved to dismiss on the grounds that Chang does not have standing and this court therefore lacks subject matter jurisdiction pursuant to Mass.R.Civ.P. 12(b)(1).[5] The Winklevoss defendants have also moved to dismiss under MassR.Civ.P. 12(b)(6), on the ground that the complaint fails to allege facts sufficient to establish that there was an enforceable contract or the existence of a partnership. Mosko and Finnegan further assert that, under California law, Chang’s tort claims are time-barred. Even were that not the case, they argue that the factual allegations of the complaint do not support a claim that, but for their conduct, Chang could have received a better result, or that their conduct was knowing or intentional. Finally, Mosko claims that the court lacks personal jurisdiction over him.
DISCUSSION
In order to withstand a motion to dismiss, a plaintiffs complaint must contain “allegations plausibly suggesting (not merely consistent with) an entitlement to relief, in order to reflect [a] threshold requirement . . . that the plain statement possess enough heft to sho[w] that the pleader is entitled to relief.” Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1966 (2007) (internal quotations omitted). While a complaint need not set forth detailed factual allegations, a plaintiff is required to present more than labels and conclusions, and must raise a right to relief “above the speculative level . . . [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact).” Id. See also Harvard Crimson, Inc. v. President & Fellows of Harvard Coll., 445 Mass. 745, 749 (2006).
I. The Winklevoss Defendants’ Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Mass.RCiv.P. 12(b)(1)
In deciding a motion to dismiss under Mass.RCiv.P. 12(b)(1), a court may consider affidavits and other evidence outside the face of the complaint. Ginther v. Commissioner of Ins., 427 Mass. 319, 322 n.6 (1998). While under a Rule 12(b)(1) motion the burden is on the plaintiff to prove all the jurisdictional facts, Williams v. Episcopal Diocese of Massachusetts, 436 Mass. 574, 577 n.2 (2002), the court takes as true the allegations in the complaint. Cross v. Commissioner of Correction, 27 Mass.App.Ct. 1154 (1989) (rescript).
Standing is treated as an issue of subject matter jurisdiction. See Doe v. The Governor, 381 Mass. 702, 705 (1980). “The question of standing is one of critical significance. From an early day it has been an established principle in this Commonwealth that only persons who have themselves suffered, or who are in danger of suffering, legal harm can compel the courts to assume the difficult and delicate duty of passing upon the validity of the acts of a coordinate branch of government.” Tax Equity Alliance v. Commissioner of Revenue, 423 Mass. 708, 715 (1996) (internal quotations and citations omitted). ‘To have standing in any capacity, a litigant must show that the challenged action has caused the litigant injury.” Slama v. Attorney General 384 Mass. 620, 624 (1981).
The Winklevoss defendants argue that the court lacks subject matter jurisdiction because the settlement proceeds have not been distributed and thus Chang has suffered no injury. The flaw in this argu *325 ment is that the defendants appear to conflate loss of the settlement proceeds with loss of rights. Chang alleges that he has received nothing in return for the substantial benefits he provided to ConnectU, including the value of his work, as wells as i2hub’s users and goodwill. Although he seeks as a remedy his share of the proceeds, the basis of his claims is that he has rights either under the Memorandum or as a partner in WCG. Otherwise put, although he may (or may not) be deprived of his share of the settlement agreement, he asserts a contractual right to compensation for the work that he and i2hub performed for ConnectU in the form of an ownership interest in ConnectU.[6] While Chang’s claims with respect to the settlement proceeds are too speculative to confer standing, his claims with respect to an ownership in ConnectU are not. They constitute an injury separate and distinct from his possible share of the settlement proceeds. The court concludes that Chang has pled sufficient facts to confer standing with respect to his claims against the Winklevoss defendants.[7],[8]
II. Finnegan and Mosko’s Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Mass.R.Civ.P. 12(b)(1)
The determination is otherwise as to Chang’s claims against defendants Finnegan and Mosko. Chang argues that he was injured because he was deprived of the opportunity to participate in the settlement agreement at a time when, he claims, he would have negotiated a more favorable outcome. He further argues that Mosko failed to advise him of his right to independent counsel and to assert at that time claims against the Winklevosses, identical, he states, to those asserted in this action.
Chang is correct that lost settlement opportunities may constitute an injury sufficient to support a claim of legal malpractice. See, e.g., Moores v. Greenberg, 834 F.2d 1105, 1107-08 (1st Cir. 1987); Fishman v. Brooks, 396 Mass. 643, 647 n. 1 (1986). That said, the court concludes that, on the facts of this case, any injury as a result of missed settlement opportunities is far too speculative, and any causal connection to the defendants’ conduct far too attenuated, to confer standing. Any claim to the proceeds rests, of necessity, on Chang’s claim of ownership rights in ConnectU. As to Chang’s claim that he could have asserted claims against the Winklevoss defendants at the time of the settlement, nothing in the complaint supports an inference that the delay caused him injury.[9],[10] Therefore Chang lacks standing to assert his claims against Finnegan and Mosko.
III. The Winklevoss Defendants’ Motion to Dismiss for Failure to State a Claim Under Mass.RCiv.P. 12(b)(6)
A court may dismiss a complaint for failure to state a claim only where the moving party shows to a certainly that the plaintiff is “entitled to no relief under any state of the facts.” DiNitto v. Town of Pepperell, 77 Mass.App.Ct. 247, 249 (2010). See also President & Fellows of Harvard Coll., 445 Mass. at 748 (“The purpose of rule 12(b)(6) is to permit prompt resolution of a case where the allegations of the complaint clearly demonstrate that the plaintiffs claim is legally insufficient”).
A. Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing (Counts I and III)
Counts I and III allege that the Winklevoss defendants breached their contractual duties under the Memorandum. The Winklevoss defendants respond that the Memorandum was merely an “agreement to agree” that not only specifically contemplated a formal contract, but also left open key terms. Therefore, the argument goes, the Memorandum is unenforceable.
Under Massachusetts law, parties to a preliminary agreement may provide for the execution of a more formal document. See. e.g., Goren v. Royal Inv., Inc., 25 Mass.App.Ct. 137, 142 (1987). “A proviso of this sort should speak plainly.” M.[11] When, however, the parties have agreed on all material terms, the court can infer that the purpose of a final document is to serve “as a polished memorandum of an already binding contract.” Id. at 140. “It is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement.” Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000). However, “(i]t is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract.” Id.
The Memorandum provides for the integration of the entities’ respective technologies; upon completion the Winklevoss defendants were to give Chang the option to exercise his right to a 15% stake. The option can be exercised “if and only if’ ConnectU terminates the relationship after integration or does not enter into a holding company with i2hub. Ex. A. The Memorandum contains a provision for the nullification of Chang’s option if “i2hub secures a license with a major record label [or] i2hub decentralizes its software in accordance with the Indue Act.” The next day, Chang indicated his acceptance of these terms. The transaction was not a complex one requiring intricate final documents. See Goren, 25 Mass.App.Ct. at 139. The court considers that the Memorandum sets forth all the material terms of the agreement, and is thus sufficient to form a valid contract.
The Winklevoss defendants hang their hat on the final sentence of Cameron’s email, which reads “Wayne, if you agree to those terms we can proceed to writing up a formal contract.” as evidence that the Memorandum was merely an agreement to agree. The court, however, can infer from this that the parties intended only to execute a more polished version of *326 the terms contained in the email. I[12],[13] Nothing in the complaint indicates that the parties did not intend to be bound by the terms of the Memorandum. In any event, a consideration of the intent of the parties is a question of fact not appropriate for a motion to dismiss under Mass.R.Civ.P. 12(b)(6). See Seaco Ins. Co. v. Barbosa, 435 Mass. 772, 779 (2002) (“[i]f a contract . . . has terms that are ambiguous, uncertain, or equivocal in meaning, the intent of the parties is a question of fact to be determined at trial”).
Even were the court to conclude otherwise, Chang has alleged sufficient facts to support his contention that he performed under the Memorandum. See Lambert v. Fleet Nat’l Bank, 449 Mass. 119, 125 (2007) (“where a binding agreement has been established, it will not necessarily fail because of the indefiniteness of one or more terms, especially where one party has already performed”). See also Keating v. Stadium Mgmt. Corp., 24 Mass.App.Ct. 246, 251 (1987) (“[tjhere is no surer way to find out what parties meant, than to see what they have done”). For the above reasons, Chang is entitle to adduce evidence of the intent of the parties to the Memorandum. Therefore, Counts I and III will not be dismissed.
B.Breach of Partnership and/or Joint Venture and Breach of Fiduciary Duty (Counts II and IV)
Counts II and IV are predicated on Chang’s contention that he and the Winklevosses entered into a partnership and/or joint venture to form WCG.[14] The Winklevoss defendants take the position that no partnership was formed where there was no agreement to act as partners, no sharing of profits or losses, and no participation by Chang in the management and control of the enterprise. Because there is no written agreement, the court must determine whether Chang has alleged sufficient facts to support a contention that the parties had an oral agreement.
The question of whether there is a partnership is one of intent that must be proven by either an express agreement, written or oral, or inferred by the conduct of the parties. Fenton v. Bryan, 33 Mass.App.Ct. 688, 691 (1992). “[W]here persons associate themselves together to cany on a joint business for their common benefit, to which each contributes either property or services, and the profits arising therefrom are to be shared between them, the essential elements of a contract of partnership are made out.” McMurtir v. Guiler, 183 Mass. 451, 453 (1903). “There must be a voluntary contract of association for the purpose of sharing the profits and losses . .. and an intention on the part of the principals to form a partnership for that purpose.” Boyer v. Bowles, 310 Mass. 134, 138 (1941).
Chang’s complaint alleges that the parties agreed to form a holding, or umbrella company, eventually called the Winklevoss Chang Group, through which they would co-own and operate i2hub and ConnectU, as well as other projects. He contends that they agreed to each hold a fifty-percent ownership of WCG. In an internet chat exchange with Chang, Tyler Winklevoss (“Tyler”), arguing that the Winklevosses’ initial contribution of $7500 entitled them to an additional 5% of WCG, stated “it was a 50/50 split on parent company originally or that was the ballpark.” According to the complaint, the assets of i2hub were used to benefit WCG, and i2hub’s revenue was directed to ConnectU. The Winklevoss defendants contributed the assets of ConnectU, including its website. Chang also alleges that he performed administrative and management functions, and created and integrated multiple additional websites. On March 4, 2005, Tyler emailed Chang with a proposed draft of “The Winklevoss Chang Group Advertising Information.” The parties solicited music licensing deals together at a meeting with Sony and Mashboxx in New York in December 2004, and promoted WCG on websites and in print advertisements, including the sides of buses operated by the Pioneer Valley Transportation Authority.
The Winklevoss defendants point out that the word “partnership" is nowhere in any of the conversations quoted in the complaint. They also contend that nothing in the complaint alleges any sharing of management, control, or losses and profits. ConnectU contributed, according to the complaint, an initial $7500 for WCG’s operations; Chang contributed his services and i2hub’s assets, and i2hub’s revenue was directed to ConnectU. Tyler refers to a “50/50 split.” Together the parties jointly solicited promotional partners and music companies, and jointly advertised WCG’s products. The court considers that, taking the above factual allegations and all reasonable inferences therefrom as true, the complaint is sufficient to withstand a motion to dismiss Count II. Because the Winklevoss defendants’ argument with respect to Chang’s claim of breach of fiduciary duty rests on their contention that there is no partnership, and given the court’s conclusion in that regard, Count IV will not be dismissed.
C.Unjust Enrichment and Quantum Meruit (Counts V and VI)
As to Counts v. and VI, for quantum meruit and unjust enrichment, Chang has asserted both tort and breach of contract claims which, if the Winklevoss defendants are held liable, will adequately compensate him for any losses. See, e.g., Fox v. F&J Gattozzi Corp., 41 Mass.App.Ct. 581, 589 (1996); see also MCI Worldcom Communications v. Department of Telecommunications, 442 Mass. 103, 116 (2004). Therefore Counts v. and VI must be dismissed.
D.Accounting and Constructive Trust (Counts VIII and IX)
With respect to Count VIII for accounting, such relief is available where there is a fiduciary relationship between the parties and damages are due one of the parties as a result of fiduciary breach or fraud. See Ball v. Harrison, 314 Mass. 390, 392 (1943); Milbank *327 v. J.C. Littlefield, Inc., 310 Mass. 55, 61 (1941). As to Count IX for constructive trust, a court in equity may impost a constructive trust only “in order to avoid the unjust enrichment of one party at the expense of the other where the legal title to the property was obtained by fraud or in violation of a fiduciary relation.” Barry v. Covich, 332 Mass. 338, 342 (1955). Here, although this court has concluded that Chang’s tort claims may go forward, there has been no determination as to any breach of fiduciary duty. Since that determination has not yet been made, dismissal of Counts VIII and IX would be premature.
E. Conversion (Count VII)
In order to establish conversion, a plaintiff must show that the defendant “intentionally or wrongfully exercise(d) acts of ownership, control or dominion over personal property to which he has no right of possession at the time ...” Grand Pacific Fin. Corp. v. Brauer, 57 Mass.App.Ct. 407-12 (2003). Otherwise put, the plaintiff must set forth facts sufficient to support an inference that he had an immediate right or title to possession of the property allegedly converted. Mazeikis v. Sidlauskas, 346 Mass. 539, 544 (1963).
Chang’s claim in this regard rests solely on his contention that the Winklevoss defendants converted his share of the settlement proceeds. It fails for the reason, if no other, that he has set forth no facts from which the court can infer that he has a right to immediate possession of the money. Count VII must therefore be dismissed.
ORDER
For the foregoing reasons, the Motion of Cameron Winklevoss, Tyler Winklevoss, Darya Narenda, Howard Winklevoss and ConnectU (f/k/a ConnectU LLC) to Dismiss All Counts of Plaintiffs’ Complaint for Lack of Subject Matter Jurisdiction and Failure to State a Claim (Paper #16) is DENIED as to Counts I, II, III, IV, VIII and IX, and ALLOWED as to Counts V, VI and VII. Their Motion for a Stay is DENIED as moot. The Motion of Scott R. Mosko and Finnegan, Henderson, Farabow, Garrett & Dunner to Dismiss all Counts of the Plaintiffs’ Complaint for Want of Subject Matter Jurisdiction and Failure to State a Claim (Paper # 21) is ALLOWED. Scott R. Mosko’s Motion to Dismiss for Lack of Personal Jurisdiction is DENIED as moot.

 Chang asserts that Mosko agreed to a provision in the settlement agreement to release all claims by Chang. Although the agreement is not contained in the record, in the District Court’s order granting Facebook’s motion to enforce the settlement dated June 25, 2008, a quoted portion of the agreement provides that the “ConnectU founders represent and warrant that (1) They have no further right to assert against Facebook (2) They have no further claims against Facebook & its related parties.” No documentation before the court prohibits any claim by Chang against ConnectU or its principals.

On that same day, the court clarified the above language in response to a request by ConnectU’s counsel in the Massachusetts action, Quinn Emmanuel Urquhart & Sullivan LLP (“Quinn Emmanuel”) to honor an attorneys’ lien by making a disbursal jointly in the name of ConnectU and Quinn Emmanuel. Although the court denied Quinn Emmanuel’s motion, it stated that “the requirement that the distribution be held ‘in trust’ for ‘any lawful claimant’ was intended to enforce the Settlement Agreement, but in doing so to permit the Quinn Emmanuel law firm to perfect any lien and to assert any perfected lien against the proceeds in the hands of the Boies, Schiller & Flexner LLP law firm.” On November 8, 2010, the Supreme Court of New York entered an order affirming an arbitration decision awarding attorneys fees and interest, to be paid from the escrowed settlement proceeds held by BSF. The California court denied Quinn Emmanuel’s request to satisfy the arbitral award, finding it premature where ConnectU had appealed the New York Supreme Court’s judgment. There remained, the court concluded, an issue as to whether Quinn Emmanuel was a lawful claimant to the settlement proceeds. Pl.’s Memorandum of Law in Opposition to Defendants Mosko and Finnegan’s Motion for a Protective Order, Ex. G.

The court notes that, because ConnectU is now wholly owned by Facebook, Chang cannot recover from ConnectU. Rather, he would have to recover from the Winklevoss defendants a percentage of the settlement proceeds in proportion to his ownership interest in ConnectU, as determined by a fact finder.

The complaint sets forth claims against the Winklevosses and ConnectU for breach of contract (Count I); against all the Winklevosses for breach of partnership and/or joint venture (Count II); against all the Winklevosses and ConnectU for breach of the covenant of good faith and fair dealing (Count III); against the Winklevoss defendants and ConnectU for breach of fiduciary duly (Count IV), unj ust enrichment (Count V), quantum meruit (Count VI), conversion (Count VII), accounting (Count VIII) and constructive trust (Count IX); and against Mosko and Finnegan for professional negligence (Count X), civil conspiracy (Count XI), aiding and abetting (Count XII), and tortious interference with contractual and/or advantageous business relations (Count XIII).

The Ninth Circuit’s April 11, 2011, decision disposes of the Winklevoss defendants’ argument with respect to their motion to stay pending appeal.

While his complaint does not assert a claim for a declaration of rights and obligations, the court notes in that regard that the declaratory judgment act provides a remedy; it does not confer subject matter jurisdiction or standing. Enos v. Secretary of Envtl. Affairs, 432 Mass. 132, 135 (2000).

Given the Ninth Circuit’s decision, Chang would be free to assert a claim for his share of the proceeds.

Chang claims that the “any lawful claimant” language of the California court’s November 21, 2008 order applies only to Quinn Emmanuel. While the court may have included that language in order to protect Quinn Emmanuel’s rights, it does not preclude any other party from asserting a claim to a share of the proceeds.

While the court’s conclusion in this regard effectively disposes of Chang’s remaining claims against Finnegan and Mosko, were the court to conclude otherwise, his claims would fail under Mass.R.Civ.P 12(b)(6). As to Count X for professional negligence, the complaint fails to assert any facts that would tend to show “that he probably would have obtained a better result had the attorney exercised adequate skill and care.” Fishman v. Brooks, 396 Mass. 643, 646 (1986). As to Counts XI, and XII, for civil conspiracy and aiding and abetting, the complaint utterly fails to set forth any facts to support a claim that Finnegan or Mosko knew of the Winklevoss defendants’ conduct with respect to Chang’s ownership interest, and gave them substantial assistance or encouragement. See, e.g., Kurker v. Hill, 44 Mass.App.Ct. 184, *328 189-90 (1998). As to Count XIII, for tortious interference, Chang has not set forth any facts to show that, even if he had an advantageous relationship with the Winklevoss defendants, Finnegan or Mosko knowingly and intentionally induced a breaking of the relationship by improper motive or means. See. e.g., Blackstone v. Cashman, 448 Mass. 255, 260 (2007). Labels and conclusions, without more, are insufficient to withstand a motion to dismiss. Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008).

Given the court’s conclusion in this regard, it need not address Finnegan’s argument that California law applies, or Mosko’s motion to dismiss for lack of personal jurisdiction.

The Goren court provided the following example: “The purpose of this document is to memorialize certain business points. The parties mutually acknowledge that their agreement is qualified and that they, therefore, contemplate the drafting and execution of a more detailed agreement. They intend to be bound only by the execution of such an agreement and not by this preliminary document.” Goren v. Royal Inv., Inc., 25 Mass.App.Ct. 137, 143 (1987).

The Winklevoss defendants argue that the terms “integration,” “major record label” and “decentralizes its software in accordance with the Induce Act” are sufficiently indefinite to invalidate the contract. The court does not agree. The cases they cite stand for the proposition that, in the absence of material terms, a contract is invalid. The court has already concluded that the Memorandum contained all essential terms. Furthermore, as discussed, supra, it is not necessary that all terms be precisely defined. See Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000).

To the extent that the Winklevoss defendants argue that Chang has failed to exercise his option, the Memorandum is silent as to the time frame within which he may do so. In any event, this action asserts his rights of ownership.

In a joint venture, the parties agree to associate in a single, limited enterprise, while a partnership is generally formed for the transaction of general business. See Shain Investment Co., Inc. v. Cohen, 15 Mass.App.Ct. 4, 7 (1982). The distinction is not material to the resolution of this motion.